Argued March 28, affirmed April 11, 1950

STROH, Administrator *v.* RHOADS

217 P. (2d) 245

*L. E. Recken,* of Portland, argued the cause for appellants. On the briefs were Senn, Recken & Recken, of Portland.

*Maynard Wilson,* of Cottage Grove, argued the cause and filed briefs for respondent.

Before LUSK, Chief Justice, and BELT, BAILEY, HAY and LATOURETTE, Justices.

LATOURETTE, J.

This is an appeal by defendants from a judgment against them in the sum of $10,000.00 recovered by

plaintiff in an action for malpractice. The defendants are osteopaths operating a hospital known as "Rhoads Clinic & Hospital" at Eugene, Oregon, Dr. Rhoads being the owner and Dr. Overton being in his employ.

On the 10th day of June, 1947, at approximately 2:30 p.m., Mrs. Stroh, the deceased, went into defendant Rhoads' hospital for a regular check up prior to childbirth, she having been given pre-natal treatment by the defendants since the 27th day of February, 1947. The evidence discloses that the baby was born at approximately 8:05 p.m., and that deceased died at approximately 11:25 p.m. on said 10th day of June, 1947.

The complaint charges the defendants with failure to exercise proper care and skill under the circumstances and contains six allegations of negligence on the part of the defendants. For the purpose of this appeal, it will be necessary to consider only Specifications 2 and 3, which are as follows: "In failing to observe immediately or within a reasonable time after child birth, the fact that deceased's cervical artery was ruptured." and, "In failing to tie the ruptured cervical artery." The complaint further alleges that the death of Blanch Stroh was due to such negligence.

The action was brought by the plaintiff as administrator of the estate of decedent for the benefit of himself and the four minor children.

At the conclusion of the trial, defendants moved for a directed verdict, and the motion was denied.

The first assignment of error is that the court erred in failing to sustain the objection of defendants to the hypothetical question propounded to Dr. Robert P. Merrick.

■ The hypothetical question and the objection thereto are too lengthy to quote verbatim in this opinion. The question was propounded on the events that occurred between the time the deceased entered the hospital and the time of her death. The objection to such question is based on two grounds: (1) "it assumes facts which are not in evidence and assumes other facts which are not proven"; and, (2) "now a lot of those things are not incorporated in this question and I submit for that reason the question is not a proper question. There is not a proper foundation laid." The entire objection with one exception was directed to the failure of the plaintiff to place before the doctor in the hypothetical question certain matters in evidence concerning the care of deceased. It has been held many times by this court that it is not necessary to include in the hypothetical question every element of evidence, and this the defendants concede in their brief as follows: "If the hypothetical question fairly includes enough evidence to permit the witness to form an intelligent opinion that such a question should be answered." See *Carruthers v. Phillips*, 169 Or. 636, 645, 131 P. (2d) 193, 162 A. L. R. 1301.

■ Defendants, in the points and authorities of their brief on the above assignment of error, rest their case on the first ground of objection as follows: "The question was clearly exaggerated and unwarranted by any testimony in the case, an objection to it should be sustained."

Reverting to the question involved, there is only one claim in the objection thereto that there was an exaggeration of the facts, and that is: "there is no evidence in this case that the vein collapsed." In answer to this, we need only to refer to the testimony of the

husband, Calvin Stroh, who testified that several attempts were made to inject blood plasma in the veins of deceased but those failed, whereupon an incision was made across the arm in order to get at the vein, but that this was unsuccessful. An incision was then made on the side of the neck in an attempt to insert the needle in the jugular vein; this also failed, and that it appeared to said Calvin Stroh that the veins were collapsed.

In defendants' brief it is claimed that plaintiff in the hypothetical question exaggerated the evidence in several particulars. None of these particulars was pointed out to the trial court in the objection to the question other than the one concerning the collapsed vein. It is held in *Hamilton v. Kelsey*, 126 Or. 26, 40, 268 P. 750, that the point of objection must be specific, and the stock objection, "not a proper foundation laid," is too general and not proper.

There was no error in overruling the defendants' objection.

■■ The second assignment of error is directed to the court's failure to sustain the objection of the defendants to a hypothetical question propounded to Dr. Arthur P. Martini and failure to strike the answer of such witness. The question, objection, answer of witness and motion are as follows:

"Q. Now the baby was born at approximately 8:05 and the mother taken to the ward almost immediately, about 8:10, and the physical condition of the mother is not checked by the doctors or nurses for a period of forty-five minutes. Would you say that that treatment is that of a doctor exercising that degree of skill and care ordinarily exercised in the practice of surgery in this locality under like circumstances?

"MR. SENN: Same objection, on the ground that there is no evidence to sustain that question. The testimony was that the nurses did come in and that they notified the nurses and they came.

"THE COURT: There is some testimony to that effect. The question is eventually for the jury to decide.

"A. I would say no, that was not exercising good care for this reason—

"MR. SENN: Just a minute. I don't think that's proper. That is argument. He can answer the question yes or no.

"THE COURT: I think he may state his reasons for his answer.

"A. You can't expect a person to know what is wrong with them. That is why they go to the doctor. The doctor or the nurse is trained to observe when things are going wrong and there should be someone to watch for that.

"MR. SENN: I move to strike the answer because it is not responsive and not a proper element of evidence.

"THE COURT: The motion is overruled.

"MR. WILSON: Q. What would the ordinary care and skill in the practice of surgery in this locality dictate as being correct treatment?

"MR. SENN: The same objection and on the ground that he has answered the question. What he would do and what somebody else would do is not evidence.

"THE COURT: He may answer as to what the approved practice in the community is.

"A. It is the business of a doctor or nurse to observe and see how a patient is getting along."

The question above propounded was based on the evidence of the husband and a Mrs. Mildred McCullough, a patient in the ward with the deceased.

It has been held by this court in *Neppach v. Oregon & Cal. Railroad Co.*, 46 Or. 374, 399, 80 P. 482, that it is proper for an expert witness to give the grounds and reasons for his opinion. See also 20 Am. Jur., Evidence, 661, § 787. The objection and motion were not well taken.

The third assignment of error is based on the failure of the court to grant the motion of defendants for an order directing the jury to return a verdict for the appellants, and each of them, and that there was no substantial evidence that the defendants, or either of them, had been guilty of negligence or malpractice, and that such alleged negligence caused the death of deceased.

■ On a motion for a directed verdict, the record must be viewed and the evidence interpreted in the light most favorable to the plaintiff, and such motion admits the truth of plaintiff's evidence and every favorable inference to be drawn therefrom, as well as that which may be drawn from the defendant's evidence.

■ Was there substantial evidence the the defendants were guilty of negligence, and that such negligence caused the death of deceased?

It appears that to accelerate birth, Dr. Overton injected pituitary extract, and that the child, weighing 10 pounds 13 ounces, was delivered within one and one-half hours thereafter; that approximately three hours after the delivery of said child, the deceased died.

It is established by the evidence that due to the size of the child, deceased's cervical artery was ruptured, and a hemorrhage resulted therefrom. The flow of blood was not checked, whereupon said deceased bled to death.

Let us next examine the treatment and care the defendants gave to deceased. The evidence establishes that after the child was delivered, deceased was wheeled from the delivery room into a two-bed ward, where she was placed in bed; that about 45 minutes thereafter, she complained that she felt as though she was lying "in a puddle." Her husband discovered a large amount of blood in the bed, whereupon he summoned a nurse. Treatment from that time consisted of the following: the nurse inserted a small packing in the vaginal opening and administered pituitary extract to stop the bleeding. Dr. Overton was called and immediately began massaging deceased's uterus, which massaging was continued constantly until death approximately two hours later. Dr. Rhoads arrived shortly after Dr. Overton, removed the small packing and inserted a speculum for the purpose of packing the uterus but did not examine the vagina or uterus. He then repacked the lower segment of the uterus with a large pack; blood plasma was thereupon administered. It is borne out by the admission of Dr. Rhoads that the deceased became weaker and finally passed away because of loss of blood. It is further established that the defendants did not at any time make an examination of the cervix or of the uterus to determine the cause of bleeding; in fact, Dr. Rhoads admits this.

Dr. Rhoads further testified as follows:

"Q. But ruptured cervical arteries are not rare?
"A. They are not rare. We see many of those.

"Q. And the procedure is to tie the artery?
"A. Yes.

"Q. It is not ordinarily necessary to open the patient up to do that?
"A. That's right."

There is medical testimony that if bleeding continues after the uterus has been massaged from two to five minutes, the proper practice requires an examination to determine if there is a piece of afterbirth remaining or if there is a laceration of the cervix. This examination was not made.

There was further competent testimony that tying of the artery would be the proper way of stopping the bleeding, and that the location of the ruptured artery was such that this could have been accomplished. Medical testimony intends to establish that the defendants in the treatment of the deceased did not exercise that degree of skill and care ordinarily exercised in the practice of surgery in the locality under like circumstances.

From the foregoing it appears that there was substantial evidence for the jury to determine that defendants were negligent in failing to locate and to tie the ruptured cervical artery, and that such negligence caused the deceased to bleed to death. Affirmed.