29 N.J. Super. 545 (1954)
103 A.2d 33
STANLEY COMPANY OF AMERICA, A CORPORATION, PLAINTIFF-RESPONDENT,
v.
HERCULES POWDER COMPANY, A CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 11, 1954.
Decided February 18, 1954.
*548 Before Judges JAYNE, CLAPP and FRANCIS.
Mr. Samuel A. Gennet argued the cause for the respondent (Mr. Howard T. Rosen, of the New Jersey Bar, and Mr. Samuel Marion, of the New York Bar, on the brief).
Mr. Harold A. Price argued the cause for the appellant (Messrs. Pitney, Hardin & Ward, attorneys; Mr. Frank C. O'Brien, of counsel).
The opinion of the court was delivered by FRANCIS, J.A.D.
Respondent sought a recovery on account of damage claimed to have been suffered by its motion picture theatre as the result of an explosion in appellant's plant. After a lengthy trial, the jury awarded a substantial verdict. Reversal of the consequent judgment is now sought because of a number of alleged trial errors.
The Baker Theater, owned by respondent, is located at 39-41 West Blackwell Street, Dover, N.J. This is 4 to 4 1/2 miles east of the Hercules Powder Company plant in Kenvil where nitroglycerin is manufactured. It was built in 1905 and has a seating capacity of 1,435 persons.
The original roof construction consisted of a series of five wooden trusses, each with a 60-foot span, extending from sidewall to sidewall. Between the upper chords of the *549 trusses were rafters on which wooden sheathing and roofing had been installed. Ceiling joists were attached to the bottom chords. Metal lath was fastened to the bottom of the ceiling joists and a plaster ceiling was affixed to the lath.
In 1924 the front of the theatre was rebuilt and at this time the wooden truss located in that part of the building was replaced with one of steel. The remaining four wooden ones were not disturbed.
In 1941 the trusses were inspected. They were basically in good sound condition; there was no dry rot, no visible deterioration of the wood, and there were no termites. However, there was a slight localized deflection of one of them. Re-examination in 1942 showed the same condition and it was then corrected.
A further inspection in 1945 disclosed that no appreciable change had taken place since the 1942 repairs.
On June 21, 1948 an explosion of a total of 30,900 pounds of nitroglycerin took place at appellant's plant. Appellant offered proof to the effect that there were three separate explosions, one of 7,000 pounds of nitroglycerin, the second of 12,500 pounds, separated from the first by "just about a minute," and the third of 11,400 pounds, "about a second" later. However, witnesses for the respondent spoke of hearing and feeling one explosion.
The blast was a severe one. It cracked walls and ceilings of some private dwellings and a stairway in one of them. A church stands next door to the theater. There is evidence that the four-foot thick walls of its stone tower were split as well as its vestibule floor. One witness, who was working on a machine in a nearby factory, said the building shook. The manager of the theater was thrown out of his office chair by the concussion.
In the afternoon of June 25, the porter of the theater found pieces of plaster in the balcony, which he observed had fallen from the ceiling at the point where it joins the wall on the right side of the theater. He noticed also that the ceiling was "broke all the way along on both sides." The manager was notified and engineers were called in to inspect *550 the condition. As a result, on June 27 the theater was closed for repairs.
One of these engineering experts, Ruderman, is the person who made the inspections in 1941 and 1942. Following the explosion he studied the damage on June 28 and 29. At this time he discovered that the bottom chords of two of the trusses were definitely ruptured. They had cracks in them, which were variously described as "fresh," "new," "recent," "less than a month old," "one week, two weeks, maybe, definitely not three" weeks old. The ruptures appeared in the bottom chord at about its intersection with the top chord at each end of the truss. The breaks consisted of vertical cracks and there was a sagging of two or three inches at these points.
He could not tell the full extent of the damage because the cracks extended into the interior of the wooden trusses, so the minimum extent of the damage was observable from the outside. In any event, the injury to the bottom chords of the two trusses was "quite severe" and he would not want to put "any load on" or "any faith" in them. In his judgment the building was unsafe for occupancy.
According to Ruderman, a force or forces suddenly applied would produce the fractures he observed. They would result from "a sudden shock"; "it would have to be a very large, suddenly applied, recent force." It was the kind of damage that could be produced "by a force such as a lifting of the truss and the dropping of it."
An additional important factor came into the case through this witness. Aside from the fractures referred to there was nothing particularly wrong with the trusses. The condition was the same as it had been in 1942 when the local deflection of the one truss was neutralized. There was "absolutely no evidence of any deterioration in the structure of the wood, anything like rot, fungus or borers." And the new cracks had no relationship whatever with the 1942 bowing of the truss.
Dr. Hans Bleich, a professor of engineering at an eastern university, who exhibited substantial qualifications in the *551 field of effects of explosives on structures, also testified for respondent.
After perusing a topographical map of the area between the explosives plant in Kenvil and Dover, he expressed the opinion that the terrain was such as to cause the effect of the explosion in Dover to be increased rather than decreased  that is, "larger than average." The reason is that a hill intervening between an explosion and a target will have a shielding effect, but a target located in a valley or on the side of a hill in a valley will suffer a heavier impact. However, he did not believe that here the terrain was a paramount consideration.
In explaining the effect of force generated by such a large amount of explosives, he said that the force travels from the explosion to the target (which was his way of referring to the object or structure damaged) at approximately the speed of sound. At the explosion a heavy pressure is generated which expands in waves in all directions. At the target the air presses against the building and then tries to pull away from it. "The principal effect of an explosion of this magnitude and at this distance is a pressure effect on the target, on the building, like someone taking a ball and squeezing it in his hands."
He had computed the force produced at the target under the conditions presented and with the explosions in the two or three steps described. The result of the computation was not given on direct examination, but the statement was made that the force would be sufficient to do some damage to an old, weak structure. Inquiry on cross-examination revealed that the peak pressure would amount to ten pounds per square foot at the height of the roof of the theater, and on redirect examination it was said that a load of approximately ten pounds per square foot would be damaging to the structure under consideration.
In discussing the strength of the trusses, the witnesses for both parties spoke of dead load and live load. The dead load is the weight of the roof on the trusses and a live load *552 would be any outside load added thereto, such as snow, for example.
Types of live loads were distinguished. A live load of ten pounds per square foot of an impact nature, such as an explosive force, may have up to twice the effect of a uniformly applied live load. If a person were to stand on a board, the ends of which rested on supports, his weight would be a live load. But if such person jumped from a height on to the board, his weight would be a live load of impact force. It would be the equivalent of increasing the static load up to twice the weight.
In answer to a rather long hypothetical question containing an outline of the material facts adduced in support of respondent's theory of the case, and which also asked Dr. Bleich to assume that the described damage to the trusses "in the opinion of the qualified licensed professional engineer who examined the same was caused by a recent, very large, severe, suddenly applied outside force or shock * * *," the conclusion was given that "there was a causal connection between this explosion of 30,000 pounds approximately in the defendant's plants and the damage done to the structures; * * *."
Another engineering expert who had examined the trusses on July 1, 1948 also said they showed recent fractures which were less than a month old. The damage, in his judgment, was caused by a recent overloading beyond their strength. And a suddenly applied live load of ten pounds per square foot in all probability would have caused the trusses to fail and would have caused the failure he observed.
There was additional expert testimony to the effect that these trusses "were weak in their end connections" against their normal dead load and "particularly weak in shear against an impact load" judged by "today's design." But it was said also that as designed and in their condition in 1948 they were proper for the regular loads to be carried. There were other methods of using wooden trusses; each method had its advantages and disadvantages. And one of the disadvantages of the method employed in respondent's theater *553 is that under impact forces the trusses "will go faster." And one of the experts said that on the basis of actual computations he made, a load of ten pounds applied to the roof as an impact force would be beyond the ultimate strength of the trusses.
The above synopsis of the evidence has been drawn primarily from respondent's case. Of course, the proof is in conflict.
Appellant's expert testimony was to the effect that the three explosions had distinct and unrelated effects. Separated by about a minute in the one instance and by a second in the other, it was asserted that their impact forces were as separate as if the detonations had come on different days. Consequently, appellant's proof was that under the existing conditions the maximum peak pressure in the vicinity of the theater following the series of explosions was between one and two pounds per square foot.
Trial of the case consumed about three weeks, at the conclusion of which a motion for dismissal was denied and the factual conflict submitted to the jury for determination. The verdict for the theater owner resulted.
No question as to the issue of negligence is raised on this appeal. It is conceded that the verdict is dispositive as to that subject. However, appellant argues that respondent failed to establish a probable causal relation between the explosions and the alleged damage and that there was a failure to exclude other possible causes of the damage.
As the matter is presented in the brief, it savors more of an attack upon the weight of the evidence. But no motion to set aside the verdict as contrary to the weight of the evidence was presented to the trial court. And no such ground is or could be presented at this time. R.R. 1:5-3. In the discharge of our appellate function we shall deal with the problem as it must have been intended that we should, namely, that the trial court erred in not granting the motion to dismiss for failure of respondent to provide any evidence that the explosions were the proximate cause of the damage to the theater.
*554 At the outset it must be recalled that on such a motion to dismiss a weighing of the evidence is not permitted. If the record presents any evidence which would cause fair-minded men to differ as to whether there was a reasonably probable relation of cause and effect between a tortfeasor's negligence and the alleged damage, the issue must be submitted to the jury for determination. Vadurro v. Yellow Cab Co. of Camden, 6 N.J. 102 (1950).
Appellant cites a number of cases in support of the contention that the theater company's burden is not satisfied by proof of the existence of a possibility of causal relation, but that the evidence must show the existence of such circumstances as would justify the inference that the damage was caused by the wrongful act of the Powder Company and exclude the idea of a cause therefor with which it was unconnected. Callahan v. National Lead Co., 4 N.J. 150, 154 (1950); Woschenko v. C. Schmidt & Sons, 2 N.J. 269, 277 (1949); Houston v. Traphagen, 47 N.J.L. 23, 27 (Sup. Ct. 1885).
The pronouncements of these cases are simply expressions in different form of the traditional duty of the plaintiff in a negligence case to prove causal relation. Stated in the form commonly applied in the determination of the issue of whether or not a jury question exists, the obligation of such a plaintiff is to provide proof of facts or circumstances showing the reasonable probability that the defendant's act or conduct caused the damage sustained. Jochim v. Montrose Chemical Company, 3 N.J. 5 (1949); Austin v. Pennsylvania R.R. Co., 82 N.J.L. 416 (E. & A. 1911). Then, in order for the jury to grant an award it must be satisfied by the preponderance of the evidence that the hypothesis of causal connection between the defendant's act and the plaintiff's damage is more reasonably probable than any other possible hypothesis as to cause.
In the argument on this point, no other specific possible cause of the damage is suggested. Instead, references are made to absence of broken glass windows in the theater and nearby church, absence of damage to the theater skylight, *555 absence of proof that the ceiling plaster in the theater fell immediately after the explosion, and the like. These facets of the proof are simply incidents of the ultimate jury problem of causality. Particularly is this so in view of the statements by the experts of both parties about unusual or "tricky" distributions of damage in the path of explosive forces.
It is insisted that the opinion of Dr. Bleich should be disregarded completely because his answer asserted the existence of "causal connection between this explosion of 30,000 pounds approximately * * * and the damage * * *." The criticism is that there was no single explosion of 30,000 pounds of nitroglycerin, because appellant's proof established three successive explosions separated by "about a minute" and a second. Putting aside the evidence of a single blast adduced by respondent and now referred to by it, the hypothetical question clearly mentions three explosions and the pounds of nitroglycerin involved in each one. Further, the doctor testified that in making his computations of the forces generated, he considered the explosions in the two or three steps described. Thus it is a fair inference for purposes of jury consideration that the allusion to the explosion of 30,000 pounds was intended to refer to the total poundage involved.
It is noteworthy also in this connection that throughout the lengthy cross-examination of the witness no inquiry was made as to the true significance of this portion of the answer. It may be that counsel concluded, as apparently the jury did, that the doctor's statement carried the implication we have suggested.
The record is barren of proof of any other explosion which might have caused the damage on account of which the action was brought. Other possible causes which were pressed at the trial in the examination of the witnesses but which are not specifically argued under this point were the alleged weakness of the trusses due to age and structural inadequacy, and the effect of heavy snow storms during the two previous winters. It is sufficient to say as to these that *556 the jury was justified in finding on a consideration of all of the evidence that they had been excluded as more probable causes and that the relation between the explosion and the damage was one of reasonably probable cause and effect and not mere coincidence.
In any event, the facts outlined in the forepart hereof, which we have drawn from the rather voluminous record and which the jury might have found, in the aggregate adequately create a jury question on the issue of causal relation between the explosions and respondent's damage.
However, a strenuous attack is made upon the hypothetical questions put to Dr. Bleich and to two other engineering experts.
As already indicated, Dr. Bleich was asked to assume among other things that in the opinion of another engineer who had testified, the fractures and sagging of the trusses were caused "by a recent, very large, severe, suddenly applied outside force or shock * * *." It is urged that it is legally improper to include the opinion of one expert in a hypothetical question to another expert and to permit such opinion to form in whole or in part the basis for the second expert's conclusion. Such inclusion, appellant claims, without more, constitutes prejudicial error requiring reversal.
We note that the witness whose opinion is referred to did not use the word "outside." However, the objection was not made on the ground of inaccurate quotation. In fact, defense counsel's statement in objecting to the question indicates that he, too, thought the word did appear in the expert's answer. And a second defense counsel in a later hypothetical question to one of his own witnesses said that the expert in question had referred to an outside force. It is the duty of counsel to point out the particular defect or defects in a hypothetical question so the statements objected to may be corrected. In re Telsrow's Estate, 237 Iowa 672, 22 N.W.2d 792 (Sup. Ct. 1946); Stroh v. Rhoads, 188 Or. 563, 217 P.2d 245 (Sup. Ct. 1950); 58 Am. Jur., Witnesses, § 858. In any event, it is a fair inference from the facts as asserted by the expert in question that the *557 force which caused the cracks was applied to the exterior of the trusses. Specifically, his observation that the trusses were in good condition, with no deterioration, decay, fungus, dry rot or termites present, would appear to warrant the inference of force from without rather than disintegration or destruction from within. Cf. Carruthers v. Phillips, 169 Or. 636, 131 P.2d 193 (Sup. Ct. 1942).
Authority exists in a number of jurisdictions for the flat statement that an opinion of an expert, however qualified, cannot be predicated in whole or in part upon the opinions, inferences and conclusions of others, whether lay or expert witnesses. Annotations, 98 A.L.R. 1110-1114, 82 A.L.R. 1489; 20 Am. Jur., Evidence, § 787.
Such an unqualified doctrine does not accord with the realities of present day trials or of modern science. Wigmore takes the position that it is "unsound" to say that an opinion of an expert cannot be based upon opinions expressed by other experts. He says:
"There is no mysterious logical fatality in basing `one expert opinion upon another': it is done every day in business and in applied science." 2 Wigmore, Evidence (3rd ed.), § 682, p. 810.
And he might have added that in every day trials factual opinions or conclusions of both lay and expert witnesses are utilized in hypothetical questions.
For example, in this case the expert engineers characterized the cracks or fractures in the trusses as "fresh," "new," "recent." Undoubtedly a lay witness would be permitted to furnish the same opinion or conclusion after describing what he saw. Can it be said that such an opinion must be exiled from the question put to an expert witness?
Study of the many cases on the subject indicates that consideration should be given to the distinction between the opinion of an expert on the final or ultimate problem in the case, such as the causal connection between the explosion and respondent's damage, and the opinion of an expert on a matter which constitutes an intermediate factual premise *558 and which is supported by facts or factual inferences in the case.
It would seem reasonable to prohibit the inclusion of the opinion of one expert on the ultimate fact in the case in a hypothetical question asked of another expert. And it would seem reasonable also to ban the opinion of one expert on an intermediate fact or premise from such a question when the opinion of another expert is being sought on the same fact or premise. But moving backward from the ultimate problem in a given case to a consideration of the premises set out in the question, the propriety of the inquiry should not depend upon a hard and fast rule that an intermediate expert opinion cannot be included. Each case should be examined in the light of its own facts.
In New Jersey it may be deduced from the cases that litigants are entitled to frame a hypothetical question according to their theory of the case based on a reasonable construction of the evidence and the rational inferences therefrom, or based on the facts as the jury would have the right to find them. Schnoor v. Palisades Realty Co., 112 N.J.L. 506 (E. & A. 1934); Daggett v. No. Jersey St. Ry. Co., 75 N.J.L. 630 (E. & A. 1907). Cf. 58 Am. Jur., Witnesses, § 854; 20 Am. Jur., Evidence, § 796.
Our courts do not seem to have adopted an unyielding rule on the particular problem under discussion. The former Supreme Court, in Ten Eleven Corp. v. Brunner, 135 N.J.L. 558, 560 (1947), said that "generally" it is improper to include the opinion of another expert in a hypothetical question.
The Appellate Division in the recent case of Hagerman v. Lewis Lumber Co., 24 N.J. Super. 120 (1952), affirmed 13 N.J. 315 (1953), recognized the general rule but did not apply it so as to reverse the trial court.
In that case factually it appeared that Hagerman had suffered a compensable accident in 1945 which resulted in a cardiac condition. The compensation award of 35% of total disability was fully paid on November 18, 1948. He died May 14, 1949, and his widow filed another petition alleging *559 that the heart ailment culminated in his death from coronary thrombosis.
The ultimate issue in this proceeding therefore was causal relation between the original accident and the coronary death. The family physician who had been in attendance from the date of the accident to the time of death said that Hagerman had a myocardial infarction resulting from a coronary thrombosis. The damaged heart grew progressively worse and he went downhill gradually. In the spring of 1948 the doctor noticed rales which he said indicated heart failure. In November 1948 the slightest exertion caused pain and the disability was then total. A few hours before death, Hagerman was suffering very severe pains in the chest and the doctor asserted that the cause of death was coronary thrombosis which was directly related to the original accident.
An expert cardiologist was called by petitioner and given a hypothetical question incorporating all the facts, including the opinion or factual conclusion of the family physician that he noticed rales in the spring of 1948 which indicated heart failure, but excluding his opinion on the ultimate issue. After the objection that the question improperly included the opinion of the treating physician was overruled, the cardiologist declared that the accident caused the fatality.
It will be observed immediately that the included opinion of the family physician merely related to an intermediate factual premise, namely, that in the spring of 1948 the facts or symptoms indicated heart failure.
The court regarded the testimony of the first doctor about the finding of rales as a statement of fact, and the conclusion that they showed heart failure as a matter of opinion. The opinion was regarded as objectionable but harmless when given to a "recognized cardiologist" in association with the facts on which it was based.
In other words, the cardiologist, knowing the facts as well as the opinion, might accept both as true statements of the doctor's finding and opinion and as an intermediate premise for his opinion on the ultimate question, or he might disregard the opinion as being inconsistent with his *560 own knowledge and experience and reach his own conclusion without regard to it; or being confident of his own knowledge and experience, he might consider the opinion of another physician as simply a detail or circumstance of no persuasive influence one way or the other.
In the present case it is apparent from the testimony that Dr. Bleich is a person of wide experience and attainments. Before the hypothetical question was presented to him, he had explained the effect of forces originating from explosions; he had computed the peak pressure resulting from the Powder Company's explosions, and had concluded that an old and weak structure might show some damage from such forces. After answering the question and during further examination on these subjects he said that such forces would cause some damage to the building in question.
Further, his own computations demonstrated that the explosions would produce a peak pressure of ten pounds per square foot in the neighborhood of the theater and that such pressure would be damaging to the trusses involved. In answer to a defense inquiry he, too, said the cracks described were two to three weeks old.
When the factual conclusion of the other engineer that the fresh cracks and sagging were caused by "a recent, very large, severe, suddenly applied outside force or shock" was stated in the question, the factual background of the opinion was also included. This consisted of a description of the theater construction, and of the trusses, of the absence of evidence of structural overloading, of absence of deterioration or dry rot in the trusses, the cracking of the plaster along the west side of the ceiling, the falling of pieces thereof, and the cracks on the outside surface of the trusses.
As already indicated, Dr. Bleich was eminently qualified to draw his own conclusion on the given facts as to the kind of force which caused the cracks and sagging and as to whether or not the force was recently applied. And in view of his qualifications and his opinion on the ultimate fact in issue, the causal relation between the explosion and the damage to the theater, in our judgment the inclusion *561 of the intermediate opinion was not error, but even if it was it occupies the same status as the opinion in the Hagerman case, that is, harmless and not prejudicial error. Cf. Commonwealth v. Mabey, 299 Mass. 96, 12 N.E.2d 61 (Sup. Ct. Jud. 1937).
Similar objections are made to questions asked of two other experts called by the theater owner. One engineer was asked for his opinion as to whether a "suddenly applied force of 10 pounds per square foot on those trusses, as you observed them, could have caused the damage that you observed." The use of the word "could," which imports possibility, made the question improper, but no objection was made on that ground and the witness cured the deficiency by answering that "A suddenly applied load of 10 pounds per square foot in all probability would have caused the trusses to fail."
The criticism advanced is that the query is predicated upon the opinion of Dr. Bleich that these explosions would produce a force of ten pounds in the area of the theater. Although Dr. Bleich's statement in this regard perhaps partakes somewhat of the nature of an opinion, actually his testimony was that he took all the factors in the case into consideration and computed scientifically the force in pounds per square foot which would be generated. In fact, one of the appellant's experts said he made the same kind of computation and arrived at the result of one to two pounds pressure per square foot. The fact that two experts reach different conclusions from individual calculations does not eliminate recognition of either conclusion as a scientific fact for purposes of inclusion in a hypothetical question. It simply means that variant factors were used in making the computations.
There is nothing in the record to demonstrate that such computations are speculative rather than scientifically feasible and accurate. It must be assumed from the nature of the proof that the calculation is a statement of a scientific fact and entitled to be employed as such in a question to another expert.
*562 It is objected also that the questions inquired as to the effect of a suddenly applied load of ten pounds per square foot. Here again the reference to the impact nature of the load was properly referred to because it was a factual inference from the testimony. Testimony that there were explosions and that they generated forces which travel at the speed of sound, of itself justifies the factual inference that contact with such forces would constitute a suddenly applied load.
One other ground of appeal concerns itself with expert testimony. It appears that one of appellant's experts was asked a hypothetical question in much the same form as it was put to Dr. Bleich. His answer denied that the explosion caused the theater damage. When he was asked for the reasons on which the opinion was based, respondent's objection to the question was sustained.
Ordinarily such action would constitute error. The affirmative or negative answer of an expert witness standing alone has little value. His reasons and their cogency are the real means by which the weight and credibility of his opinion are evaluated. Cf. D.L. & W.R.R. Co. v. City of Hoboken, 16 N.J. Super. 543, 562 (App. Div. 1951), reversed on other grounds, 10 N.J. 418 (1952); Stroh v. Rhoads, supra, 188 Or. 563, 217 P.2d 245, 247 (Sup. Ct. 1950); Magnuson v. State, 187 Wis. 122, 203 N.W. 749, 754 (Sup. Ct. 1925); In re Henry's Estate, 276 Pa. 511, 514, 120 A. 454, 455 (Sup. Ct. 1923); Venuto v. Lizzo, 148 App. Div. 164, 132 N.Y.S. 1066 (App. Div. 1911); People v. Bird, 124 Cal. 32, 56 P. 639, 640 (Sup. Ct. 1899); 20 Am. Jur., Evidence, § 787.
The direct and cross-examination of the witness, including various arguments about his testimony, went on for 66 pages. Then he was withdrawn before the cross-examination was completed so that another person could testify. When he was recalled, the cross-examination continued for 12 more pages. Then on redirect examination the hypothetical question was posed to him. After giving the answer, he was asked for the reasons, and the objection thereto was made *563 but overruled. Two attempts to answer were begun and each time the answer was stricken because the court felt that it was not responsive and brought in irrelevant matter.
During further argument it was urged that the subject was improper redirect examination. To this the court said:
"Well, you may have something there on what is to come, may have something in what has gone, but I will permit the hypothetical question and the answer to stand, so far as that is concerned, even though it may not be considered strictly redirect, but I will permit that to stand.
Is there anything else we should talk about before the jury returns?
Mr. O'Brien: Well, I have no objections. I only have just a few more questions."
Counsel then indicated that he desired to ask the witness, among other things, which had the greater effect on the roof, the heavy snowfall of the previous winter or the ten-pound impact load produced by the explosion. But the court declared that it "is not only improper redirect but I think it is unnecessary."
Additional redirect examination was followed by cross-examination in which the witness said that whether or not a suddenly applied load of ten pounds per square foot would break the trusses depended "upon the deflection" and, after more questions, that he didn't think "it would break the truss." Further redirect examination was attempted to obtain the reason why the truss would not be broken and it was cut off by objection.
Control of the examination of witnesses, particularly on redirect examination, is a matter which must be left largely to the discretion of the court. The examination under study had reached the point where its curtailment by the court in our judgment did not constitute a mistaken use of that discretion.
It may be noted in passing that so far as the snow storm is concerned, there was testimony already in the record by this witness that on the basis of his examination and computation the trusses in question had a capacity of 26 pounds *564 per square foot dead load and 20 pounds per square foot live load. There was further proof through another defense witness that in the vicinity of Dover the snowfall was measured at 29 inches. This the witness said would weigh over 30 pounds per square foot. Under the circumstances, the situation with respect to the possible causal relation between the snow-fall and the recent fractures that came to light after the explosions was presented for consideration by the jury.
It may not be amiss to offer a practical suggestion for use in long trials like this one where the parties expect to use expert testimony and hypothetical questions. Such questions are important and sometimes crucial. Consequently, if they are prepared in advance and copies given to the court and the adversary, the problem of their legal propriety can be discussed with the court and settled before they are put to actual use. In this way, necessary amendments or corrections can be made and the form decided upon, thus avoiding much of the not inconsiderable delay and argument at the time of actual use. Cf. Psychiatric Testimony in Probate Proceedings, 2 Law & Contemporary Problems 448, 454 (1935).
The trial court's action in admitting and rejecting certain items of evidence and in refusing to charge certain requests, is cited as error.
We have examined each complaint and find nothing of such a character as would require the conclusion of prejudicial error. R.R. 1:5-3(b); Dolan v. Newark Iron & Metal Co., 18 N.J. Super. 450, 455 (App. Div. 1952).
Error is predicated upon the refusal to charge a request on proximate cause. The record shows that although the charge in question was refused, another also submitted by defendant was charged. It follows:
"While proof of certainty is not required, the evidence must be such as to justify the inference of probability as distinguished from possibility. You are not free to merely speculate as to the explosion being the cause of the building's condition. Unless you find that the plaintiff has proved the existence of such circumstances as would justify the inference that the condition was caused by the explosion and would exclude the idea that the condition *565 was due to a cause with which the defendant was unconnected, then your verdict must be in favor of the defendant, should be no cause for (sic) action."
This charge adequately presented to the jury the problem of causation.
The judgment is affirmed.