**Everett Melvin ROBERTS, Plaintiff-Appellee,**

v.

**UNITED STATES of America et al., Defendants,**

**and**

**Union Carbide Corporation, etc., Defendant-Appellant.**

**No. 13706.**

United States Court of Appeals Third Circuit.

Argued April 5, 1962.

Reargued Nov. 20, 1962.

Decided April 18, 1963.

Baruch S. Seidman, South River, N. J. (Martin P. Devlin, Jr., Trenton, N. J., on the brief), for appellant.

George Pellettieri, Trenton, N. J. (Pellettieri & Rabstein, Trenton, N. J.,

and William G. Freeman, Haddonfield, N. J., on the brief), for appellee.

Before McLAUGHLIN and HASTIE, Circuit Judges, and SHERIDAN, District Judge.

SHERIDAN, District Judge.

This is an appeal by defendant-appellant, Union Carbide Corporation, from a judgment entered on a jury verdict in favor of Everett Melvin Roberts, plaintiff-appellee, and from the denial of motions for a directed verdict and a new trial.[1]

Plaintiff, 28 years old at the time of trial, brought an action in the United States District Court for the District of New Jersey against Union Carbide Corporation, Dow Chemical Co.[2] and the United States of America,[3] defendants, to recover damages for personal injuries resulting from the negligence of the defendants during the time plaintiff was employed as a mechanic at Lakehurst, New Jersey.

Plaintiff contended defendant manufactured and sold an inherently dangerous substance, ethylene glycol, and failed to warn users of its dangerous nature and its adverse effect on their lives, health and limbs, and that plaintiff suffered severe and permanent injuries which were caused by close contact with and exposure to the ethylene glycol. The jury returned a verdict of $210,000 in favor of plaintiff and against defendant.

■ This is a diversity case. The district court had jurisdiction under 28 U.S.C.A. § 1332. The substantive law of New Jersey applies.

Defendant's principal arguments on appeal are that the evidence did not establish either a causal relationship or a foreseeable risk, and that the court erred in permitting certain expert testimony.

■ Plaintiff is entitled to the benefit of every inference which reasonably can be drawn from the evidence most favorable to him. Ayers v. Parry et al., 3 Cir., 1951, 192 F.2d 181. The evidence most favorable to plaintiff supports the following, which we accept. Plaintiff was employed as a mechanic by All American Engineering Co. on premises of the United States at Lakehurst, New Jersey, from January to December, 1957. As part of his duties he worked on hydraulic arresting gear, which was being experimentally tested for use by the United States Navy on aircraft carriers. He tested the gear for leaks by filling it with ethylene glycol and then bleeding it to release residual air. About 350 gallons of ethylene glycol were used in this process. Defendant was the manufacturer of the ethylene glycol, which was delivered in 50–55 gallon drums labelled, "Union Carbide". There was no warning to users.

Each time the gear was filled with ethylene glycol, the valves had to be bled several times. There were six valves, each with a ⁵⁄₁₆th inch opening. Plaintiff bled these valves from four to six times on each weekday from February through April. Starting with the lowest valve, plaintiff placed a small container to catch the fluid that ran out as he opened the valve to release the air. As the pressure increased, he bled the upper valves. He opened the top valve, which was at eye level, with a wrench in one hand and caught the fluid in a bucket held in the other hand. First came a puff of air, then a mist or fog of ethylene glycol, and then the fluid. The mist and fluid spurted under 400 pounds of pressure and

---

1. Roberts v. Union Carbide Corporation, Civil Action No. 1390–58, District of New Jersey. The district court did not file an opinion.

2. The court dismissed the action against Dow Chemical Co. pursuant to a stipulation of the parties entered into during the pretrial proceedings.

3. The action against the United States was tried by the court without a jury. The jury and nonjury trials proceeded simultaneously. During the presentation of plaintiff's case, plaintiff notified the court he had no other evidence of liability to offer against the United States, whereupon the court granted a motion to dismiss.

came in contact with his shoulders and head. Another valve emitted ethylene glycol mist from the stomach area upwards into his face. Mist and fluid from a third valve, also at eye level, sprayed upon his head and shoulders. Fluid from another valve poured into the container at great pressure, causing it to splash on plaintiff's face, chest and arms. A mist or fog of ethylene glycol was present during the entire bleeding operation. While the building in which plaintiff worked had six windows, the only ventilation came from a door when someone entered or left the building.

In June, 1957 plaintiff experienced difficulty with his vision for the first time. In August, 1957 he failed to pass his automobile driver's test because of defective vision. In December, 1957 he was forced to leave his employment at Lakehurst. He worked at odd jobs until December, 1959, but has not been employed since that time.

Plaintiff is suffering from bilateral retrobulbar optic neuritis, or an inflammation of the optic nerve heads in each eye, posterior to and at the entrance to the eyeball. He has lost all vision in his left eye, and has only about 10 to 20 percent vision in his right eye. This condition is irreversible. He also has ceco. central scotoma, or a blind spot in his vision directly in front of him, is afflicted with other nerve and organic disorders, and suffers from severe depression. He is totally and permanently incapacitated with confinement to a wheel chair probable within a year. His life expectancy is not more than 10 years. All of these conditions are the direct result of exposure to ethylene glycol. Prior to employment at Lakehurst, plaintiff was in excellent health.

Defendant attacks plaintiff's expert witnesses because their conclusions were not based on personal knowledge or familiarity with ethylene glycol, and because they had no knowledge of harmful effects from ethylene glycol other than through oral ingestion.

■ Dr. Lam, a neurologist and neuropsychiatrist who treated the plaintiff, and Dr. Brieger, a specialist in internal, preventive, and occupational medicine, and toxicology, testified without objection to their qualifications. Defendant did not move to strike their testimony. Each had an impressive background and substantial experience in dealing with disorders caused by toxic substances. Each was familiar with literature on the toxic effects of ethylene glycol when orally ingested. Dr. Brieger had performed experiments in which rats were subjected to ethylene glycol mist. While neither knew cases, other than of oral ingestion, in which ethylene glycol had neurotoxic effects, both concluded that plaintiff's disorder was a toxic disease of his nervous system caused by exposure to ethylene glycol. This testimony was for the jury. It was not destroyed because their only experience or knowledge had been with cases of oral ingestion. Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 1951, 190 F.2d 825; 2 Wigmore, Evidence § 569 (3d ed. 1940).

Defendant points to the testimony of Dr. Lam that in all cases of neurotoxic effects from ethylene glycol known to him there was kidney damage, and that he observed no kidney damage to the plaintiff. This is not significant in view of the other testimony. Dr. Lam testified that certain tests made prior to his examination showed that plaintiff had had some kidney injury, but that by the time kidney tests were administered by him, the kidney had regenerated; that the kidney can withstand a considerable degree of insult and recover; and that if the optic nerve is atrophied, it will not regenerate. There was similar testimony by other experts. There was also testimony that there were known cases of death following ingestion of ethylene glycol in which there had been no kidney damage.

■ Another of plaintiff's expert witnesses, Dr. Bradley, an industrial hygienist and toxicologist, testified that

ethylene glycol mist is toxic to human beings. Defendant objected to his competency to testify on the toxicity of ethylene glycol, and on its effect on humans. Dr. Bradley had extensive training and experience in the field of toxicology. This included training in chemistry, two years of scientific work in a medical school, and many years' experience in working with chemical compounds. His entire career had been devoted to toxicology. He had viewed several hundred individuals who had been exposed to various kinds of toxic compounds. He was permitted to testify because of his training in chemistry and related fields and his extensive experience as a toxicologist. This was proper. Stertz v. Briscoe, 1959, 184 Kan. 163, 334 P.2d 357, 70 A.L.R.2d 1021.

Dr. Tassman, who supervised the treatment of plaintiff, testified ethylene glycol was an alcohol and was toxic, but admitted he did not know the toxic factor. He was a physician opthalmologist, specializing in diseases of the eye. He had extensive training and experience.

None of these witnesses stated the reason for the toxicity of ethylene glycol. Through their training and experience, which included training in chemistry and related fields, they had personal knowledge of the facts supporting their conclusions. It was not necessary to detail these facts, particularly since defendant admitted ethylene glycol was toxic,[4] but rather, this was at the option of the cross-examiner. Sanders v. Glenshaw Glass Co., 3 Cir., 1953, 204 F.2d 436; 2 Wigmore, Evidence §§ 675, 562, 655 (3d ed. 1940).

The qualification of an expert is a matter within the discretion of the trial judge and his decision will be reversed only when it is clearly erroneous. In Trowbridge v. Abrasive Co. of Philadelphia, supra, this court said:

"Defendant contends, however, that this evidence is inadmissible because plaintiff's expert was not qualified to testify with respect to practices in the abrasive wheel industry. It is admitted that the expert, one Dr. Peskin, is a graduate engineer, with extensive experience in industry. His specialty is the strength of materials, and he has had considerable theoretical training in that field at Massachusetts Institute of Technology. He was an instructor at that institution, and received his Doctor of Science degree there in 1936. Defendant asserts that Dr. Peskin was not qualified to testify because he has had no practical experience in the manufacture of abrasive wheels.

"Defendant's arguments are addressed to the wrong forum. The qualification of an expert is a matter peculiarly within the discretion of the trial judge. It has been reiterated time and again that an appellate court will reverse on this ground only when the decision of the trial judge is clearly erroneous. Bratt v. Western Air Lines, 10 Cir.1946, 155 F.2d 850, 166 A.L.R. 1061, certiorari denied 1946, 329 U.S. 735, 67 S.Ct. 100, 91 L.Ed. 635; Diesbourg v. Hazel-Atlas Glass Co. supra [3 Cir., 176 F.2d 410]; Hencken v. Bethlehem Municipal Water Authority, 1950, 364 Pa. 408, 72 A.2d 264. It it hardly within the province of this court to determine what is the optimum degree of specialization in the scientific world. We note in passing, however, that the wider per-

---

4. Interrogatory 21 and defendant's answer, offered in evidence by plaintiff.

"Question: State in detail any and all illnesses and/or injuries found to result either directly or indirectly from the drinking, contacting, immersing and/or exposure of persons with ethylene glycol.

"Answer: The literature pertaining to the physiological aspects of the chemical indicate large single doses of ethylene glycol injure by depression of the central nervous system (and) by small, repeated doses manifest a toxic action which centers chiefly in the kidneys."

spective of the broad specialist may be of invaluable assistance to the trier of fact; the narrow specialist, on the other hand, may be limited by occupational myopia. At any rate, these questions are matters for the trial court, and we cannot say that the district court abused its discretion."

See also Rockland Electric Company v. Bolo Corporation, 1961, 66 N.J.Super. 171, 168 A.2d 817.

■ There was other evidence of causation, much of it supplied by defendant. In answers to interrogatories defendant admitted that exposure to ethylene glycol mist is hazardous.[5] At the trial Dr. Smyth, a defense witness who had supplied the information for preparation of the answers, explained, " * * * in my vocabulary 'mist' includes the products of hot oxidation by air as well as droplets of the unchanged chemical." He said he had in mind mist created at high temperature, but also referred to other types of mist, did not establish preheating as the only way to create such mist and did not rule out mist created by forcing glycol through small openings at high pressure. The answer and the explanation were for the jury. Dr. Smyth testified that a person could swallow safely two ounces of ethylene glycol, but that a quantity might harm one person and not another. He was familiar with literature which reported disturbance of vision following inhalation. Even if oral ingestion cases are the only known cases of harm, it is possible that no person was ever exposed to ethylene glycol in the same manner as plaintiff. Johnson v. Kosmos Portland Cement Co., 6 Cir., 1933, 64 F.2d 193, 196, certiorari denied 1933, 290 U.S. 641, 54 S.Ct. 60, 78 L.Ed. 557. Plaintiff's and defendant's experts differed mainly in the quantity, the type of exposure, and the effects from exposure. Their testimony and all the other evidence of causation were exclusively for the jury. Brett v. J. M. Carras, Inc., 3 Cir., 1953, 203 F.2d 451; Pritchard v. Liggett & Myers Tobacco Company, 3 Cir.1961, 295 F.2d 292; Martin v. Bengue, Inc., 1957, 25 N.J. 359, 136 A.2d 626, 2 Wigmore, Evidence § 663 (3d ed. 1940).

Defendant contends there is no evidence of foreseeability, assuming, arguendo, a causal relationship.

■ One who supplies, directly or indirectly, or through another, a product for another to use is subject to liability for bodily harm caused by the use of the product in the manner for which it is supplied, if the supplier knows, or from facts known to him should realize, that the product is or is likely to be dangerous for the use for which it is supplied, and has no reason to believe that those for whose use it is supplied will realize its dangerous condition, and fails to exercise reasonable care to inform them of such conditions or facts which make the product likely to be dangerous. Martin v. Bengue, Inc., supra; Restatement, Torts § 388 (1934).

■ Defendant argues that there is no evidence that ethylene glycol is a dangerous substance, or that defendant knew or should have known that exposure to ethylene glycol mist is harmful. As noted above, there was ample evidence, both in defendant's answers to interrogatories, and in the testimony, that ethylene glycol can be harmful to a human being. There was also sufficient evidence to establish actual or constructive knowledge of harm from the type of exposure to which plaintiff was sub-

---

5. Interrogatories 14–A and 14–B and defendant's answers, offered in evidence by plaintiff.

"Question 14–A: Is ethylene glycol an inherently dangerous substance and dangerous to life, health and limb of persons coming in contact with same or being immersed in or exposed thereto?

"Answer: No.

"Question 14–B: Give your reasons for the preceding answer.

"Answer: The only hazard that can arise from ethylene glycol would be from internal injury resulting from oral ingestion and upon inhalation of vapors if user heats it or is exposed to it in the form of fine mists."

jected. In answers to interrogatories defendant stated that ethylene glycol is hazardous if the user is exposed to it in the form of fine mists, that large doses are injurious to the central nervous system, and that small repeated doses manifest a toxic action which centers chiefly in the kidneys. The optic nerve is part of the central nervous system. Dr. Smyth[6] testified that prior to 1955 he and defendant knew from experiments that rats which inhaled a dense fog of ethylene glycol for thirty days, seven hours a day, five days a week, sustained minor injuries to the kidneys and lungs. He said it was possible to create a fog by mechanical means, dense enough to be unsafe for a man to breathe eight hours a day for several days, but indicated that the fog would probably have to be so dense that you could not see your hand close to your face; that in many cases, animals react differently to chemical exposure than humans; that his opinion of a safe dosage for human beings was not supported by any literature; that a dosage not harmful to one person may injure another, and that ethylene glycol, when inhaled, could be absorbed into the system through the mucous membrances of the nose and trachea. For several years prior to 1957 defendant knew that ethylene glycol, taken internally, could harm a human being. From the first time it manufactured ethylene glycol, commercial containers were labelled with cautionary statements that it could be harmful or fatal if swallowed, and that it should not be stored in open or unlabelled containers. In view of this, the incomplete data on a safe quantity which could be ingested, and the admission that inhalation is a means by which the substance can be ingested, the jury could have found foreseeability. Defendant stresses that this is the first "indictment" against ethylene glycol under the circumstances, and urges this is a bar to a finding of foreseeability. We disagree. In Martin v. Bengue, Inc., supra, the Supreme Court of New Jersey said:

"The fact that the product may have been used by many people over a considerable period of time without prior injury would not preclude the finding of foreseeability and negligence. See Farley v. Edward E. Tower & Co., supra [271 Mass. 230, 171 N.E. 639, 86 A.L.R. 941]; Johnson v. Kosmos Portland Cement Co., 64 F.2d 193, 196 (6 Cir., 1933), certiorari denied, 290 U.S. 641, 54 S.Ct. 60, 78 L.Ed. 557 (1933). Cf. Vander Groef v. Great Atlantic & Pacific Tea Co., 32 N.J.Super. 365, 371, 108 A.2d 472 (App.Div.1954); McCormick, Evidence, 353 (1954); Morris, 'Proof of Safety History in Negligence Cases,' 61 Harv.L.Rev. 205 (1948)."

To be subject to liability, it is not necessary that the defendant could have foreseen the very injury which occurred, that an injury was sure to occur, the extent of the injury, or the manner in which it occurred, but rather it is sufficient that defendant's conduct was a substantial factor in bringing about the injury and it knew or should have known that some injury might occur. Mitchell v. Friedman, 1951, 11 N.J.Super. 344, 78 A.2d 417.

Defendant challenges a ruling of the district court which permitted Dr. Brieger to answer a hypothetical question[7] which ended:

"Question: You are to include what you heard, their testimony, their diagnosis, their prognosis and

6. Since 1937 Dr. Smyth has been employed by defendant under a fellowship with the Mellon Institute of Industrial Research of Pittsburgh, to head an experimental toxicology laboratory for defendant. He described this laboratory as defendant's toxicology department and reported his findings to the defendant's medical director.

7. "Question: . . . and a short time thereafter he consulted a physician about his eyes and subsequently in October of '57, was admitted to the Wills Hospital where he was treated under the care of Dr. Tassman; then he developed a nerve condition, for which he was treated by Dr. Lam of St. Louis—I believe you were in court during the entire testimony of

their findings in the hypothetical question which I have propounded to you?

"Answer: Yes."

On appeal defendant says the question was improper because it incorporated the opinions of Dr. Tassman and Dr. Lam and because it was based in part on their testimony as Dr. Brieger heard it.

The cases and authorities are divided on whether a hypothetical question may include opinions of other experts, and whether it may include testimony of others which is not particularized in the premises. Professor Wigmore states that the exclusion from hypothetical questions, of the expert opinions of other witnesses is unsound; for a hypothetical opinion may be based on data observed or data inferred and that inferred data presented by expert testimony may equally well become a part of the basis for a hypothetical question. Wigmore adds that,

"There is no mysterious logical fatality in basing 'one expert opinion upon another'; it is done every day in business and in applied science." 2 Wigmore, Evidence § 682, at page 810 (3d ed. 1940). For a discussion of whether a hypothetical question may include testimony of others which is not particularized, see 2 Wigmore, Evidence § 681 (3d ed. 1940).

Defendant cites Stanley Co. v. Hercules Powder Co., 1954, 16 N.J. 295, 108 A.2d 616, 45 A.L.R.2d 1106. In that case the New Jersey Supreme Court, in reviewing the Superior Court's opinion (1954, 29 N.J.Super. 545, 103 A.2d 33) on a similar question did not expressly disapprove of this form of question. Both the Supreme and Superior Courts referred to Professor Wigmore's views and to authorities including New Jersey cases, holding the form of question generally to be improper. The Superior Court held that the form of question in that case was not

these two doctors that I have just mentioned—

"Answer: Yes.

"Question: And you heard their entire testimony?

"Answer: Yes, I have.

"Question: Now Doctor, taking into consideration all of the foregoing facts, do you have an opinion as to the probable cause of Mr. Roberts' loss of vision and the damage to his nervous system which you have heard related here in court?

"Mr. Devlin: For the record and in view of my previous objections to similar hypothetical questions, I will object for reasons previously stated. But in addition to that, your Honor, I think the doctor, the question is premature and the doctor himself has not made any diagnosis that I have heard from the stand this morning. This question is confined, apparently, to his vision and there are many other things, medically speaking, that are in this case.

"The Court: Well, I will overrule your objection and allow him to answer the question with, of course, the understanding that you will have full opportunity on cross-examination to probe into the doctor's opinion and all of his direct examination.

"Mr. Pellettieri: Your Honor, may I also give him the medical facts. I think that would cure whatever objection there is.

"The Court: I thought included in your hypothetical question was the testimony, the diagnosis and prognosis of the doctors who appeared here.

"Mr. Pellettieri: That is correct, your Honor.

"The Court: You heard that, did you not?

"The Witness: I have.

"Question: You are to include what you heard, their testimony, their diagnosis, their prognosis and their findings in the hypothetical question which I have propounded to you?

"Answer: Yes.

"Question: I ask you, taking into consideration all of those facts, do you have an opinion as to the probable cause of his disability which I have previously included?

"Answer: Yes, I have formed an opinion.

"The Court: Just a minute. Do you have anything further Mr. Devlin?

"Mr. Devlin: I was conferring with my associate.

"The Court: It is the same question again. Does he have an opinion. He says yes.

"Mr. Devlin: Of course, for the record I note my objection.

"The Court: You have an exception to my ruling allowing the answer. Go ahead sir."

error; the Supreme Court expressed no opinion as to whether it was error. Both courts, however, stated that even if the form of question constituted error, it was harmless, because the question was propounded to an expert and included facts on which the expert could base a conclusion independent of a consideration of the opinions of the other experts.

 Whether the question was improper or, if improper, whether it was harmless are matters we do not consider on this appeal. There are two reasons. First, the grounds for the objection argued on this appeal were not stated or argued in the trial court. The grounds which were stated and argued in the trial court have not been argued on appeal and, therefore, have been abandoned. If defendant had advised the court and opposing counsel of the reasons it advances at this time, the question might have been rephrased so as to remove any objection. A trial court should not be reversed on grounds other than those urged below. Mutual Benefit Health & Accident Ass'n v. Francis, 8 Cir., 1945, 148 F.2d 590; Boeing Airplane Co. v. Brown, 9 Cir. 1961, 291 F.2d 310; Burke v. Lincoln Transit Co., 1955, 37 N.J.Super. 433, 117 A.2d 521. Second, the court permitted defendant to ask similar hypothetical questions of its own experts.[8] Dr. Kurth was asked:

"* * * and also assume further all of the testimony of Dr. Lam, and in further consideration of the testimony of Dr. Lam, of his medical findings in this case, have you reached a conclusion regarding the condition with which this patient is inflicted?"

Dr. Kurth was not present to hear Dr. Lam testify. He had read his testimony. Dr. Foulger was asked a similar question. Thus, both parties were satisfied with this type of question. Under these circumstances, defendant cannot complain on appeal.

 Defendant says the trial court erred when it permitted evidence that plaintiff's life expectancy according to the tables was 42.15 years. Defendant objected because plaintiff had offered the testimony of Dr. Lam that plaintiff had a life expectancy of not more than 10 years. In personal injury actions involving permanent injuries, life expectancy tables are admissible under proper instructions, if the information contained therein is material and relevant to damages. Kappovich v. LeWinter, 1957, 43 N.J.Super. 528, 129 A.2d 299. The evidence of plaintiff's normal life span is relevant to damages for future loss of earning power. Plaintiff's reasonable expectation of life just before he received his incapacitating injuries, and his earning power during that period were at issue. The condition of plaintiff's health and other factors should be considered together with life expectancy in determining the duration of one's ability to earn money, but not the injury for which redress is sought, as that would permit the defendant to benefit by its own wrong. Littman v. Bell Telephone Co. of Pennsylvania, 1934, 315 Pa. 370, 172 A. 687.

We have considered defendant's final point that the verdict was clearly the result of mistake, passion, prejudice and partiality. We find no merit in it.

The judgment of the district court is affirmed.

8. In Spears v. Atchison, Topeka & Santa Fe Ry. Co., 7 Cir., 1958, 255 F.2d 780, 784, the court said: "By submitting to its own expert a question in the form which the court, over defendant's objection, had already ruled proper, it acquiesced in the court's ruling and cannot now be heard to complain."