Argued March 26, affirmed April 9, 1952

SMITH, Administratrix *v.* INDUSTRIAL HOS-
PITAL ASSOCIATION, a Corporation

242 P. 2d 592

*Walter J. Cosgrave,* of Portland, argued the cause for appellant. With him on the briefs were James G. Smith and Maguire, Shields, Morrison & Bailey, all of Portland.

*Donald S. Richardson,* of Portland, argued the cause for respondent. On the brief were Green, Richardson & Green.

Before HAY, Acting Chief Justice, and ROSSMAN, LATOURETTE and WARNER, Justices.

WARNER, J.

Sometime after the institution of this appeal, the plaintiff, Eugene E. Smith, died and Ida B. Smith, his wife, as administratrix of plaintiff's estate, was substituted in his stead as the plaintiff-respondent. Our

references hereinafter to the plaintiff will, however, be to the decedent, Eugene E. Smith.

The plaintiff brings this action to recover from the defendant-appellant, Industrial Hospital Association, for certain medical and hospital expenses incurred by plaintiff by reason of an operation in April, 1948, for rectal cancer. The jury found for plaintiff. The defendant rests its appeal upon the refusal of the court to direct a verdict in its favor.

The defendant is an Oregon corporation authorized to conduct a hospital association business. Prior to September 1, 1947, the defendant entered into an agreement with the Electrical Construction Company wherein it agreed, in consideration of certain monthly payments to be made by the employees of that company, to bear the expense of hospital care, medical and surgical services and certain other related services to and for the employees of the electrical company, subject, however, to the terms, limitations and restrictions expressly stated in the agreement.

The pertinent conditions of the contract with which we are concerned are:

"15. COVERAGE: This agreement shall cover the following:

"Hospital care, the services of physicians, surgeons, and specialists, including surgical operations and other services provided for by this agreement, as needed for the following conditions:

"* * * * * *

"b. Acute sickness, other than those enumerated in paragraph 20 hereof entitled '*Exemptions*', whether occurring during or outside the hours of employment. The term 'acute sickness' as used in this agreement means those ailments that develop quickly and run their course, as differentiated from ailments that develop more slowly over a longer

period of time and are more or less chronic in their nature.

"c. Chronic conditions, except those enumerated in paragraph 20 hereof entitled *'Exemptions'*, that become acute will be treated. This will include the expense of hospital care and surgical operations, when needed, for such conditions as stomach ulcers, gall stones, kidney stones, hemorrhoids, and other ailments of this nature.
"* * * * * *

"f. Cancers will be treated, including surgical operation or treatment by radium.
"* * * * * *

"16. NEW EMPLOYEES: By the term 'new employees', is meant any person who comes under the protection of this agreement subsequent to the effective date thereof. New employees shall not be entitled to services for chronic conditions, as provided in paragraphs c, d, e, f, and g cf Section 15, which may *acutely manifest* themselves during the first six months of employment under the protection of this contract * * *. (Italics ours.)

"20. EXEMPTIONS: The services provided for herein shall not apply to any disease, condition, deformity, infirmity or accidental injury *which definitely existed at the time the afflicted employee came under the protection of this contract * * *.* Employees will not be entitled to services for chronic conditions, as provided in paragraphs c, d, e, f and g of Section 15, until they have been under the coverage of the Industrial Hospital Association for six consecutive months, except when employees are entitled to credit as provided for in paragraph 17 hereof." (Italics ours.)

Paragraph 17, referred to in paragraph 20 above, has no application to the subject claim.

The plaintiff was an employee of the electrical company on September 1, 1947, and on that date formally accepted the coverage offered by the de-

fendant's agreement with his employer and began then to make the payments of the premiums required on his part. September 1, 1947, is, therefore, of importance in the solution of the questions propounded by the appeal of the hospital association.

The history of the discovery of Mr. Smith's malady and its treatment subsequent to September 1, 1947, is of special interest. A sharp pain in the lower left quadrant of plaintiff's abdomen compelled medical attention sometime late in March, 1948. He then consulted with his family physician, Dr. Marion J. Jones. The examination made by Dr. Jones the next day resulted in his referring the plaintiff to Dr. Darrell Bollam, who made a proctoscopic examination on April 1, 1948. Dr. Bollam determined the presence of a tumorous growth in the colon from whence tissue was removed for pathological study. This examination confirmed the presence of a malignant lesion. On April 9, 1948, Mr. Smith went to Emanuel Hospital in Portland, Oregon. Three days later, on April 12, Dr. W. H. Bueermann operated for rectal cancer. It will be observed from the foregoing that all the events leading to the discovery of plaintiff's serious condition and the examination and operative procedure which followed occurred after the lapse of the period of six months provided for in paragraph 20 of the contract, that is, after March 1, 1948.

The only issues raised by the defendant's answer and presented by this appeal are: (1) Did plaintiff's rectal cancer *acutely manifest* itself during the first six months that plaintiff was under the contract, that is, before March 1, 1948; and (2) did the cancer *definitely exist* on September 1, 1947, the date of plaintiff's employment by the electrical company?

It is defendant's contention that a verdict in its

favor should have been directed on the ground that defendant, by uncontradicted testimony, had established both of its defenses as a matter of law, that is, that Mr. Smith's malady had become *acutely manifest* prior to March 1, 1948, and *definitely existed* on September 1, 1947.

■ When considering a defendant's motion for a directed verdict, the record must be viewed and the evidence interpreted in a light most favorable to the plaintiff. Such a motion admits the truth of plaintiff's evidence and every favorable inference to be drawn therefrom, as well as such favorable inferences as may be drawn from the defendant's evidence. *Stroh, Administrator v. Rhoads,* 188 Or 563, 569, 217 P2d 245; *Pond v. Jantzen Knitting Mills,* 183 Or 255, 257, 190 P2d 141. It is not our function to weigh or evaluate the testimony. Our duty is to ascertain whether there is substantial evidence to support the verdict of the jury. *Allister v. Knaupp,* 168 Or 630, 643, 126 P2d 317.

■ This appeal necessitates the construction of particular words and phrases found in an insurance contract. In so doing, we are constrained to give the language so used a construction as favorable to the insured as will be permitted in good conscience and embrace every reasonable intendment in support of a view that will protect the insured and defeat a forfeiture. *Purcell v. Wash. Fid. Nat. Ins. Co.,* 141 Or 98, 103, 16 P2d 639; *Schoeneman v. Hartford Fire Ins. Co.,* 125 Or 571, 577, 267 P 815.

■ The escape clauses, represented by the conditions of exemption and exclusion which the defendant has incorporated into its contract for its own protection, as more particularly reflected by the above quoted portions of paragraphs 15, 16 and 20, are defensive in character. They cast upon the hospital association the

burden of establishing by a preponderance of satisfactory evidence that the cancer "acutely manifested" itself sometime before March 1, 1948, or "definitely existed" prior to September 1, 1947. See *Am. Life Ins. Co. v. Walker*, 208 Miss 1, 11, 43 S2d 657 (an action on a hospitalization policy wherein the defendant insurance company defended on the ground that the insured was not "in good health" at the time she came under its coverage). Also see *Francis v. Mutual Life Ins. Co.*, 55 Or 280, 287, 106 P 323; *Truitt v. National Life & Accident Ins. Co.*, 236 Mo App 1036, 161 SW2d 683, 685; *Hill v. Great Northern Life Ins. Co.*, 186 Wash 167, 57 P2d 405, 408.

■ It will be observed that if the defendant can show that cancer definitely existed prior to September 1, 1947, then proof of its acute manifestation prior to March 1, 1948, becomes unnecessary. It was not incumbent upon the plaintiff to demonstrate the nonexistence of cancer or the absence of a manifestation thereof prior to those dates. Indeed, as we shall later learn, defendant's burden in this respect was made an even greater one by employing the modifying adverbs "acutely" before the word "manifest" and "definitely" before the word "existed".

The phrases "acutely manifest" and "definitely existed", as employed in the hospital association contract, are unusually significant here. We are unable to find that these phrases or their equivalent have been heretofore judicially defined. We must, therefore, look to conventional and medical dictionaries for aid and with definitions there found, as far as may be necessary, assign meanings consonant with the context of their contract setting. Further discussion will avail us nothing until this is done.

■ In medical parlance "acute" is the antithesis of

"chronic". It means sharp; severe; having a rapid onset, a short course and pronounced symptoms. Blakiston, New Gould Medical Dictionary. From Webster's New International Dictionary (2d ed.) we learn that "manifest" is defined as "to show plainly; * * * to put beyond question or doubt * * *." In our opinion, the phrase "acutely manifest", as used in paragraph 16 of defendant's contract, means a manifestation sharp or severe in character with a rapid onset and of such pronounced symptoms that the probable existence of a given malady is thereby very plainly shown.

8. The defendant's defense, predicated upon an alleged "acute manifestation" of plaintiff's cancerous condition prior to March 1, 1948, here rests solely upon the assertion that the uncontradicted testimony showing rectal bleeding prior to that date constitutes an "acute manifestation" under the hospitalization contract completely exonerating defendant from liability. We find no merit in this contention. In the first place, the presence of the rectal bleeding, at the distant time the defendant claims it occurred, is not established by uncontroverted testimony. This we will discuss later when we give consideration to the defendant's defense premised upon the definite existence of cancer prior to September 1, 1947, and which defense necessarily relies in part for its support upon the same evidence of rectal bleeding as proof of the beginning date of the tumorous growth. A second and more cogent reason for repudiating defendant's claim of "acute manifestation" is that the testimony relative to the presence of blood, even if accepted as true, would not, in our opinion, bring it within the definition which we have above accorded to those words as they appear in defendant's contract. The uncontradicted testimony is

that plaintiff's first indication of serious trouble did not become evident until the latter part of March, 1948, when sharp and nauseating pains in his lower abdomen compelled him to immediately seek medical advice as to its cause. It was the first manifestation of that character that he had experienced. It was the first clearly pronounced symptom that warranted a medical conclusion that the cause was probably cancer. It was the only sympton which dictated the examinations and surgery following but a few days after the warnings of acute pain. Indeed, plaintiff never himself knew that he had cancer until a week or ten days after the operation removing it had been performed.

When we refer back to paragraph 20 of the hospital contract, we find the phrase "definitely existed" lodged in a sentence reading: "The services provided for herein shall not apply to any disease, [or] condition * * * which *definitely existed* at the time the afflicted employee came under the protection of this contract * * *." (Italics ours.) The defendant seeks to avoid the effect of the adverb "definitely" by arguing that it is redundant in character, superfluously giving to the word "existed" a quality with which it is inherently endowed. Counsel in essence argues that to "exist" or to have "existed" connotes a condition of certainty that cannot be made either more or less certain by the addition of "definitely". It is a postulate which may intrigue those dedicated to the study of philosophical abstractions but not one which can find acceptance here.

A major consideration for the repudiation of such reasoning when applied to the construction of the contract before us is the statutory inhibition which mandates against omitting anything from the contract to be construed. § 2-216, OCLA. This precludes

the deletion of any word written therein, especially when we can, as here, find a meaning for the word "definitely" consonant with the intent of the party using it. We think the phrase "which definitely existed at the time" can and should be read as if written "which existed as shown by definite proof." In coming to this conclusion, we are not unmindful that the contract at that point is speaking with reference to the existence of a "disease, [or] condition." All diseases or internal conditions are not self-evident to the degree where there is a universal acceptance among medical men that they, in fact, exist in a given individual at a given time. The testimony of the medical experts in this case eloquently demonstrates the truth of that assertion. The contract phrase, "definitely existed", is further proof of the defendant's recognition of that fact, and its solemn covenant is not to deny the benefits of its contract to and until the hospital association can *definitely* prove that the disease or condition complained of existed at the time the afflicted employee came under the contract's protection. The burden it creates is, indeed, heavy but it is one self-imposed.

 "Definitely," according to standard dictionaries, is declared to mean: clearly defined; not vague or general; precisely prescribed or established; fixed; precise; exact. It has been judicially declared to be synonymous with "clearly", "precisely" and "unmistakably". 11 Words & Phrases 602. It is an adverb connoting the highest degree of definition or determination, precluding vagueness or generality and conveying to the word it modifies the concept of precision and exactness, thus importing to the phrase of which it is a part an element of certainty which leaves no leeway for doubt. "Definitely existed" comprehends more than mere possibility of existence, more, indeed,

than the probability of existence unless such probability is supported by proof that all other possible causes of a given disease or condition are excluded beyond a reasonable doubt. In the instance of cancer, "definite existence" contemplates the kind of proof which produces moral certainty and conviction in an unprejudiced mind that the evidentiary symptoms of alleged cancer arose from and are related to the actual presence of cancer, and to a degree that forecloses any suggestion that such symptoms can be attributed to any malady other than cancer.

Dr. Jones, plaintiff's family physician, and Dr. Bueermann, the surgeon who removed Mr. Smith's cancer, were called as witnesses for the plaintiff. Dr. Bollam, who made the examination which led to the discovery of the malignant condition in early April, 1948, was called to the witness stand by defendant. These three medical men contributed all the expert testimony that was given.

The defendant in proof of its claim that the plaintiff's cancer definitely existed prior to September 1, 1947, relies heavily upon the evidence of bleeding before that date and particularly upon what it claims to be plaintiff's representation that it existed a year before he came under the coverage of the contract. However, even if we conclude that the plaintiff had noted bleeding at any time prior to the date he came under the provisions of the hospital contract, that in and of itself does not indicate that it definitely proves the existence of cancer approximately seven months before its first acute manifestation or before the time of his April operation.

Through the medical witnesses, we are told that rectal bleeding may imply the presence of any one or more intestinal diseases or conditions other than cancer.

By Dr. Jones we are told that "ordinary bleeding from the rectum would indicate a hemorrhoid condition", "from a hemorrhoid high up" or "from diverticula of the bowel, which is very common among people." Plaintiff sustained a reasonably severe hemorroidectomy in 1942, with continuing annoying aftereffects for some time. These included bleeding. Dr. Jones further testified that "if you have hemorrhoids once there is no reason why the other veins higher up might not dilate, you know." Dr. Bollam gave testimony that "He might have had colitis, which could cause bleeding also" and added "Yes, there are other causes of bleeding." Thus the jury was apprised that the earlier presence of blood might have been explained by other causes than the cancerous growth, i.e., hemorrhoids, colitis or a diverticula of the bowel, most of which are matters of common experience, and so expressly said by Dr. Jones as to the diverticula. These disclosures as to other possible causes of bleeding were not negatived by any evidence, and the jury was warranted in concluding that the bleeding originated from causes other than cancer. To complete its proof of the "definite existence", the burden was upon the defendant to eliminate doubt that none of the alternative causes of bleeding explained the presence of the bleeding experienced by the plaintiff prior to September 1, 1947.

We find it unnecessary to review further the medical testimony beyond pointing out a sharp contradiction between that given by Dr. Bueermann and Dr. Bollam on the conditions which are indicative of the age of the tumorous growth. It is the position of defendant that they definitely conclude that it was at least one year old. In considering this phase of the evidence, it should be recalled that Dr. Bueermann was the surgeon who

removed the malignant growth and the only doctor testifying who examined it after its excision, and that Dr. Bollam's examination was prior to the operation and in the main limited to a proctoscopic examination of the colon about five inches up from the outside, resulting in the discovery of a tumorous obstruction in the tract.

Dr. Bueermann testified:

"Q Now Doctor, I will ask you if it is possible to determine the length of time of the growth which you removed had been in existence?

"A Well, it is impossible, from the standpoint of — except from the size and except from the amount of extension. We get a relative idea. In this case the growth was freely movable, and there were no palpable glands, which indicates a fairly early type of growth. By, 'early', I mean reasonably recent.

"I will read my report dictated at the time of the operation.

"This is a quotation from the report. 'The abdomen was opened through a low mid-line incision. A mass was palpated just above the perineal resection in the rectosigmoid, which was freely mobile, and, as far as could be palpated no glandular involvement existed. Examination of the liver revealed no evidence of metastasis.'

"That means secondary involvement, secondary cancer growth which extends from the primary growth.

"Q As I understand those findings, they wouldn't indicate that it was relatively recent?

"A As far as we can tell, yes. And, that is our only way that we have of telling, the size, telling the age or the relative duration of the growth."

and the following on cross examination:

"A * * * I don't think that we can say that the growth was perhaps there for many months

by the, first of all, the reasonably free condition of the bowel, and the absence of glandular involvement. As I formerly stated, those two factors would tend to make us feel that the growth was a relatively recent origin, and by that I mean a matter of months, not days or weeks.''

Dr. Bollam stated that by looking at the growth alone, he could not tell how long it had been there but, based upon the history supplied by the plaintiff and what he ''observed'', he gave as his opinion that it had definitely existed one year. On cross examination he added that he did not think any doctor could say definitely that it was there a year before. In response to a question whether glandular involvement would be such a factor, he replied that its absence would have ''no bearing on the length of time, the age of the tumor * * *.'' As is apparent, Dr. Bollam's testimony was in conflict with Dr. Bueermann's on the relative importance of the mobility of the cancer in determining its age.

■ We are of the opinion that the lower court did not err in denying defendant's motion or in submitting the case to the jury for determination.

■ Under the authority of § 101-134, OCLA, the plaintiff is entitled to judgment for the additional sum of $350 for services of counsel on this appeal.

Affirmed.