Submitted on briefs January 7, affirmed May 1, 1957

# UNITED FINANCE CO. *v.* KLIKS
310 P. 2d 1103

Hutchinson, Schwab & Burdick, Portland, filed briefs for appellant.

Leo Levenson, Norman B. Kobin and Robert Lohman, Portland, filed a brief for respondent.

WARNER, J.

This is an action to recover a judgment for $2,130.87. It is alleged to be the balance due upon a conditional sales contract for a Pontiac automobile accruing after the car had been repossessed and sold because of the default of the defendant buyer, Margaret Kliks. After

the jury had returned a verdict in favor of defendant, plaintiff, United Finance Co., moved for a judgment notwithstanding the verdict. From the adverse judgment, the Finance Co. appeals.

The automobile was purchased by Mrs. Kliks through Ed McCaffrey, an auto dealer and mutual friend of the Kliks. The purchase contract executed by Mrs. Kliks in favor of McCaffrey was thereafter promptly assigned by him to the Finance Co.

At the time of this transaction, Mrs. Kliks was suing for a divorce and was living with her four minor children apart from her husband. From this circumstance springs the defendant's affirmative defense. Briefly stated, it is: That her husband and McCaffrey entered into a conspiracy with intent to place defendant in an extremely difficult financial position and cause her embarrassment in relation to her pending divorce suit, soon to be tried, and to that end McCaffrey persuaded and induced her to buy the Pontiac, although he well knew of her impecunious circumstances. This, she alleged, he accomplished by representing to her that he, McCaffrey, had been informed by defendant's husband (whom we will hereinafter refer to as "Barney" because of its frequent use during the trial) that Barney would provide a substantial property settlement for her in connection with the divorce suit and sufficient to enable her to comply with all of the terms of the contract.

The sole question presented by the appeal is whether or not there was sufficient evidence from which the jury could find that Mrs. Kliks had a defense of fraud to the Finance Co.'s claim. This was initially presented by plaintiff's motion for a directed verdict, which the court denied, and again raised by appellant's motion n. o. v. Both rulings were excepted to as error.

█ When a motion for a judgment n. o. v. is made following a denial of a motion for a directed verdict, as here, the record must be viewed and interpreted in a light most favorable to the party obtaining the challenged judgment. Such motion, like a motion for a directed verdict, admits the truth of the prevailing party's evidence and every favorable inference that may be drawn therefrom, as well as every inference favorable to the prevailing party as may be drawn from the evidence of the party who by his motion seeks a judgment n. o. v. *Stroh v. Rhoads,* 188 Or 563, 569, 217 P2d 245; *Edvalson v. Swick,* 190 Or 473, 478, 227 P2d 183; *Smith v. Ind. Hosp. Assoc.,* 194 Or 525, 532, 242 P2d 592. Our duty in the premises is, therefore, to ascertain whether there is substantial evidence to support the verdict of the jury. *Allister v. Knaupp,* 168 Or 630, 643, 126 P2d 317.

Plaintiff's motion pointed to three deficiencies in respect to the evidence:

(1) That it affirmatively shows that the statements attributed to McCaffrey do not constitute representations of fact sufficient for a defense of fraud and deceit, but, on the contrary, are promissory in character relating to the prediction of future conduct of independent third parties; (2) That the evidence shows that Mrs. Kliks executed the automobile contract in reliance upon her own opinion concerning a prospective settlement with her husband and did not depend upon the statements of McCaffrey; and

(3) That Mrs. Kliks had not shown a right to rely upon the statements of McCaffrey.

█ The elements necessary to constitute actionable fraud are clearly set forth as nine in number in *Conzelmann v. Northwest Poultry & Dairy Products Co.,* 190 Or 332, 350, 225 P2d 757; 37 CJS 215, Fraud § 3; *Mus-*

*grave v. Lucas,* 193 Or 401, 410, 238 P2d 780. Failure to prove any one of these essential elements is fatal to pleader's cause. *Conzelmann v. Northwest Poultry & Dairy Products Co.,* supra; *Condit v. Bodding,* 147 Or 299, 328, 33 P2d 240; 37 CJS 400, Fraud § 94.

The Finance Co.'s motion for judgment n. o. v. narrows our consideration to whether or not there is sufficient evidence to prove the three particular elements of actionable fraud which its motion specifies. In the order presented by the motion and in terms of the authorities above cited, they are: Failure to prove: (1) a representation of fact, (2) Mrs. Kliks' reliance upon its truth and (3) her right to rely thereon.

In June, 1954, when Mrs. Kliks was induced to purchase the Pontiac, she had been separated from her husband since January, 1953. A year before the instant transaction, in June, 1953, she had started the divorce suit. Mrs. Kliks' sole income consisted of monthly payments from her husband for the support of herself and their four minor children.

McCaffrey appears in this matter primarily as the agent of Barney Kliks in the implementation of Mr. Kliks' alleged scheme to entrap his wife in an improvident investment to her embarrassment and disadvantage in the pending divorce suit. He also had a personal substantial financial interest of his own in the matter to which we will later refer.

Barney Kliks is a member of the Oregon Bar, engaged in the active practice of his profession in Portland, Oregon. There he is in partnership with his father, B. A. Kliks, and his sister, Dorothy Kliks, as Kliks and Kliks. He apparently has substantial interests aside from the law, for the record indicates that the father and son are the owners of some apartment houses. It is also disclosed that Barney has, in

times past, acted as financier to McCaffrey in his operations as a buyer and seller of automobiles.

A Studebaker, purchased a few months earlier through McCaffrey, had given defendant some trouble, causing her in the spring of 1954 to express the belief that she needed a car of different type; one in which she would feel "more secure about the children." McCaffrey learned through Barney that Mrs. Kliks was looking for another car and according to McCaffrey had suggested to him it would be a good idea for McCaffrey to try to sell her a car.

McCaffrey, who appears in this matter as a witness for the defendant, then proceeded to make a contact with Mrs. Kliks. Concerning this, he testified:

"Q What then did you do relative to acquiring a new car for Mrs. Kliks?

"A Well, when I first heard about it, I understood she wanted to change cars. I didn't know how deep she wanted to go into the thing and I went out and I called her and I believe I talked to her at the house one time about how much money she wanted to spend and she had wanted to get a station wagon because it would provide more room for the children and everything, and she said for me to see what kind of a car I could get her and what the finance company would finance for her and to let her know. She said she would like to get a new car if I thought she could afford it or if we could get it financed. If we could get it financed, she would take a new car. * * *"

McCaffrey thereupon recalled that defendant had had some trouble in maintaining her payments on the Studebaker. Therefore, before calling Mrs. Kliks again he first went and talked to Barney Kliks about the proposed new car deal and testified that the following took place when he did so: "He [Barney] and his dad and

I got together in the office there and they explained to me that it would help them very much in their divorce suit if I could sell her a new car, and it would show that she had no idea as to the value of money and was a spendthrift and they said for me to go ahead and make the deal and that they would make sure I never lost anything on the deal and they said that she would get a favorable settlement and everything, and they were sure she could pay for it and if she didn't, they would see I didn't lose anything because it would help them a great deal." After this meeting with the Kliks, McCaffrey reluctantly and, he says, "against his better judgment" proceeded to induce Mrs. Kliks to execute the contract to buy a new, not a secondhand, Pontiac.

Mrs. Kliks said: "Ed knew our financial condition. He knew the children and I were on support money and that he knew that we were to go into divorce soon and our financial arrangements on divorce, and he told me that Barney had told him that there would be a good financial arrangement on our divorce and property settlement * * *." McCaffrey indicated then that he thought she would receive her money in July or August.

We turn to consider the pattern of the contract. When the car dealers learned of the purchase plan proposed for Mrs. Kilks, we are told by McCaffrey, they "thought he was crazy to do it." The total contract obligation was $4,650. This amount was computed by adding to the purchase price of the car ($3,300) the following charges: $600 paid to McCaffrey (notwithstanding that Mrs. Kliks understood from him that "he was going to charge her whatever it cost him"); $503.50 described as a "discount for carrying charge for the period of the contract," a period of 12 months;

$200 known as "dealers reserve in account with the dealers"; and $46.50 as a "credit life insurance premium." Mrs. Kliks reposing faith and confidence in McCaffrey, signed the contract on June 25, 1954. The entire sum of $4,650 was to be liquidated within a year and on a very unusual schedule. There was no down payment on the new car, by a credit for the Studebaker or otherwise. Her first payment on the Pontiac of $75 began July 27, a month later another one of like amount and a third payment on September 25 of $2,000, followed by eight monthly payments of $75 each and then a last payment of $1,900 in July of 1955. McCaffrey, when asked why he sold her a car "that cost so much money and with all those extra things on it" when he knew she didn't have any money, replied: "Well, this friend of mine, Mr. Kliks, asked me to do it and he said he'd see that I didn't lose any money on it * * *." It is a fair inference that with this assurance of protection from Kliks he felt warranted in giving the contract his endorsement reading "unconditionally guaranteed" when he assigned the contract to the Finance Co. which looked upon the deal with some show of skepticism.

We note particularly the $2,000 payment schedule in September, 1954. McCaffrey had told the defendant he thought she would secure her settlement from her husband in July or August because Kliks had "explained [to him] that she should have some part of a settlement by then * * *." This was also close to the time of the scheduled hearing and prospective final decree in the divorce matter.

Shortly after Mrs. Kliks' contract for the Pontiac was executed in June her troubles began in earnest. She made the first contract payment in July. The sec-

ond payment in August, as a friendly act to help, was made by McCaffrey.

It was just after the divorce hearing that she asked McCaffrey to take the Pontiac and return her Studebaker. It was then she learned that the Studebaker had been sold. Close to that time and about the second or third week in August, on McCaffrey's advice, she went to plaintiff and offered to relinquish the Pontiac. The car was repossessed by plaintiff in October, 1954, and sold by it in February, 1955.

At the time of trial in the divorce suit Mrs. Kliks was shocked and surprised to have Barney's counsel interrogate her about the Pontiac automobile contract, a copy of which was introduced in evidence by her husband. In her words, it was there "used against her"; but the full significance of it was not evident to her until she later learned from McCaffrey of his cooperation with her husband to accomplish her humiliation and financial embarrassment. After Mrs. Kliks had lost the Pontiac, McCaffrey, in a contrite mood, suggested a meeting with Mrs. Kliks and her sister at a place outside the Kliks home where he confessed to defendant further matters relating to his conversation with her husband. It was then he told her: "* * * Barney and his dad had talked to him in the summertime when he sold me that car and the purpose of selling me the car was to break me down physically and mentally and embarrass me before the court and prove that I wasn't able financially to handle my finances or take care of my children," thus revealing McCaffrey's first representation to Mrs. Kliks about the prospect of a settlement also involved a fraudulent concealment of a condition or plan of Mr. Kliks, which, if disclosed to Mrs. Kliks in season, would have prevented her from acting to her detriment. See *Patter-*

*son v. Western Loan and Bldg. Co.,* 155 Or 140, 144, 62 P2d 946.

Thus, by reason of the failure of the settlement which McCaffrey assured her was so soon to be forthcoming, she found herself in a short space of time, four months after signing the Pontiac contract, without any automobile for the use of herself and family and nine months later confronted with a deficiency debt of $2,130.87. All this had been as a result of her husband's alleged machinations achieved by her husband's false representation urged upon her by McCaffrey. A jury might well infer from these circumstances that the overloaded automobile contract as completed under the guidance of McCaffrey had the result desired and anticipated by Kliks. None of these events would have transpired had Kliks made a settlement with his wife as he falsely represented to McCaffrey he would do.

The testimony adduced by Mrs. Kliks and her witnesses in support of her defense stands uncontradicted. Moreover, the Finance Co. offered no rebuttal. It did not call Barney Kliks or his father to impeach the testimony of McCaffrey respecting their alleged conversation with him.

The foregoing statement of the evidence of the defendant's case is garnered entirely from the testimony of plaintiff's three witnesses (including McCaffrey), except for the references to the composition of the principal amount due on the Pontiac contract and the terms of payment. These items are supplied by evidence produced by plaintiff.

■ The contract executed by Mrs. Kliks is what is commonly known as a conditional sales contract. It is not a negotiable instrument and, therefore, the Finance Co. took it from McCaffrey subject to all equities. *Western Farquhar Machinery Co. v. Burnett,* 82 Or

174, 178, 161 P 384; *Albany State Bank v. Anthony*, 121 Or 277, 281, 254 P 806. This necessarily includes a defense alleging that the buyer was induced to sign it because of fraud. *Security Finance Co. v. Comini*, 119 Or 460, 249 P 1054.

■ We pause here to summarize the misrepresentations made by McCaffrey to Mrs. Kliks as an inducement to her to sign the contract for the purchase of an automobile selected by him and at a price and on terms approved by him beyond the bounds of her financial capacity to meet, unless the representations made by McCaffrey were true. Briefly, they were: That Mrs. Kliks would be financially able to buy a station wagon because of the assurance of Barney Kliks and his father that she would get a large settlement and that she would probably receive it in July or August; but McCaffrey did not tell her, as he then could, that the prospect of any early settlement of size sufficient to justify the car purchase was a false representation allegedly designed by her husband for the express purpose of breaking her down physically and mentally and embarrassing her before the court at trial time as one incapable of handling her finances. The record would support a finding that the representations made by McCaffrey to Mrs. Kliks concerning the future settlement were false when he made them and he knew it, for it follows if the claimed representations of Barney Kliks were true, i.e., that he would make the settlement when and as McCaffrey reported, then the Kliks prime plan to humble and discredit Mrs. Kliks in court would have come to naught. The evidence adduced by defendant on the subject of fraud proclaims McCaffrey as a speaker of knowledge and bound to Mrs. Kliks in terms of fiduciary relationship. *Richer v. Burke*, 147 Or 465, 480, 34 P2d 317.

The defense of defendant rests upon the legal premise that it is fraudulent to misrepresent the present intention of a third person to do a future act. This position, as stated in 3 Restatement 59, Torts § 525, reads:

"One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction is liable to the other for the harm caused to him by his justifiable reliance upon the misrepresentation."

This is followed, under "Comment" on page 60, by this statement:

"* * * A representation of the state of mind of the maker or of a third person is a misrepresentation if the state of mind in question is otherwise than is represented. Thus, a statement that a particular person, whether the maker of the statement or a third person, is of a particular opinion or has a particular intention is a misrepresentation if the person in question does not hold the opinion or have the intention asserted."

█ The Finance Co. contends that the statements credited to McCaffrey concerning an early favorable settlement from Mr Kliks would not constitute representations of fraud, but are merely a promissory statement or prediction as to the future conduct of third parties. In reliance it calls our attention to the following from *Hansen v. Holmberg,* 176 Or 173, 179, 156 P2d 571. "Erroneous predictions as to the future conduct of third parties will ordinarily not afford a basis for an action in deceit." Thus far and no farther the statement quoted accords with the general rule. 37 CJS 231, Fraud § 11. But, as the use of the tempering words: "will ordinarily afford * * *," indicates, it is not

a rule absolute. It has qualifications and limitations which the quotation of appellant ignores. 37 CJS 234, supra. Also see *Sharkey v. Burlingham Co.*, 131 Or 185, 193, 282 P 546; *Bond v. Graf*, 163 Or 264, 269, 96 P2d 1091. This is demonstrated by the statement immediately following appellant's quotation from the Hansen case, supra, which reads: "But, where the cases applying this rule are examined, it will be seen they lack an element which is present here, namely, *actual knowledge of the speaker* that his prediction is false." (Emphasis ours.) The very qualifying element present in the Hansen case, supra, is present in the matter at bar, i.e., the actual knowledge of McCaffrey (the speaker) that his prediction to Mrs. Kliks of an early and substantial settlement was false.

See *Patterson v. Western Loan and Bldg. Co.*, supra, where we said, at page 144: "* * * statements relating to the future will not preclude liability for fraud if such statements were intended and accepted as representations of fact and involved a matter peculiarly within the speaker's knowledge, nor if the promises and predictions also involved a misstatement or concealment of existing facts." Also see 37 CJS 235, supra.

Relating back to the Studebaker deal, Mrs. Kliks tells of her dependence upon McCaffrey in these words:

"Q Did you have an automobile before you got this Pontiac?

"A Yes. I had a 1952 Studebaker.

"Q How did you get that car?

"A I got it through Ed McCaffrey. At the time of our separation I needed a car for the four children and I went to Ed and told him that I didn't have too much money to put into a car but would he help me and he knew the situation; *fact is, he*

*probably knew more about it than anyone else at that time* and he said he would see what he could do and he got me the '52 Studebaker." (Emphasis ours.)

There is ample evidence to rebut appellant's second contention that Mrs. Kliks entered into the contract with McCaffrey in reliance upon her own opinion concerning the immediacy and extent of a prospective settlement with her husband and not upon McCaffrey's representations.

Her complete trust and dependence upon McCaffrey is captured in her statement: "There was no reason for me to believe that I couldn't trust Ed McCaffrey. There wasn't anyone else  *  *  *."

We have noted the third monthly payment under the contract jumped from $75 per month to $2,000. Referring to this "balloon" payment, her attorney asked Mrs. Kliks where she anticipated getting that money. Her reply was: From a property settlement in July (the then prospective month of the divorce trial) and that was based upon what McCaffrey had told her Barney had told him. She was then asked by counsel:

"Q Would you have entered into this contract, Mrs. Kliks, if it had not been for what McCaffrey told you?

"A No.

"Q Pardon?

"A No, No.

"Q Why?

"A Because I didn't have any money."

Later, and in response to counsel's query if she bought this car on the basis that her divorce case would be over in September, Mrs. Kliks replied: "Well, Ed

had talked to me about the money and I believed him when he said * * * that Ed understood that there would be a large property settlement and he felt he [McCaffrey] was protected and he knew I could handle financially the car.''

The third deficiency in the evidence claimed by plaintiff's motion for judgment n. o. v. is the absence of a sufficient showing of Mrs. Kliks' right to rely on the statements of McCaffrey. This is predicated upon plaintiff's claim that being represented by counsel, she had no right to rely on any alleged representations by a layman ''as to the possible future outcome of the litigation in which she was engaged.'' The fallacy of this is that no particular amount of settlement was represented. In essence, McCaffrey's representation was tantamount to saying that it would be sufficiently large and certain to warrant the car purchase. It was an assuring answer to Mrs. Kliks' immediate economic problems. It presented no legal problem requiring the intervention and advice of counsel; nor did it necessarily involve, at that juncture, at least, court sanction. Property settlements arising out of divorce suits are usually of two kinds: (1) those negotiated between the parties and mutually agreed upon prior to or during suit and (2) those which are directed by the court in the absence of such an agreement. The evidence is that she also had abundant knowledge that the income and resources of her husband were such that he was financially able to settle on her amounts far more than necessary to insure the success of the car deal.

The jury could have found a very convincing reason for not turning to attorneys for advice in the car deal in the fact that her counsel in the divorce suit, Mr. Pendergast, had died shortly before the automobile deal was consummated. She then was not well ac-

quainted with Messrs. Levenson and Kobin, attorneys who succeeded Mr. Pendergast. This is reflected by her statement in response to questions of Mr. Kobin:

"* * * There was no reason for me to believe that I couldn't trust Ed McCaffrey. There wasn't anyone else, Mr. Kobin.

"Q He was a close friend?

"A As you know, I didn't know you very well. I certainly didn't know Mr. Levenson at that time too well, and Ed was the only person I could go to. I have no family here to talk such a thing over with so I trusted Ed. I trusted him in the Studebaker and I trusted him in this car [the Pontiac]."

Even if the jury did not believe that McCaffrey was the agent of Barney Kliks for the purpose of enmeshing the defendant in a car deal beyond her financial reach and which would ultimately discredit her in the divorce matter or even if the jury declined to give any credence to testimony identifying Barney Kliks with a desire and plan to embarrass his wife, yet the charge of fraud here made can well be sustained from other evidence present in this case. Assuming McCaffrey's story concerning the interest of Kliks in the transaction is false, the record discloses testimony that the completed transaction was, nevertheless, one of attractive profit to McCaffrey, personally. He ultimately received, as we have earlier pointed out, a check from plaintiff for $600 as his profit on the sale. This amount then became a part of the $4,650 Mrs. Kliks obligated herself to pay on the Pontiac contract. We again note that the profit to McCaffrey did not accord with Mrs. Kliks' understanding of the deal. She expected that she would pay no more than the cost of the Pontiac to McCaffrey, which was $3,300, and she also expected to get some credit for the Studebaker she gave to him to

turn in on the new deal. In both instances she was disappointed by her close friend of many years.

We believe that competent, substantial testimony supports all of respondent's allegations of fraud tendered in defense of plaintiff's cause of action and that the circuit court did not err in denying the plaintiff's motion for judgment notwithstanding the verdict.

This case, raising a defense of fraud predicated upon alleged false representations repeated to the defendant, is unique in that Barney Kliks, who is credited with being the author of such statements, has had no opportunity in this matter to defend himself as to the falsity, if any, of the statements charged to him. Kliks is not a party to this action. He was not called as a witness, nor did he have any right to compel being heard as a witness if he desired to controvert any of the matters imputed to him by the defendant or her witnesses. As before indicated, we learn through this record of a pending divorce suit between the defendant and her husband, Barney Kliks. Although a hearing was had or begun in that suit sometime ago, we take notice through other official records of this court that the trial in the divorce suit referred to was continued and further hearings were still being had therein at the time this opinion was being written. Under the circumstances, we feel that it is in order for us to observe and emphasize that this decision is not intended to reflect the opinion of this court as to the truth or falsity of any statement or representation alleged to have been made by Barney Kliks to McCaffrey and, in turn, said to have been relayed by the witness McCaffrey to Mrs. Kliks. In fairness to Mr. Kliks and his father, nothing herein said concerning either of them should be construed prejudicially to them in connection with the divorce suit or any other litigation of

which we have no knowledge. With reference to that phase of the appeal, that is, what McCaffrey represented as having been said by Barney Kliks or his father, we are only holding that the record in the case at bar reveals sufficient evidence to have warranted the jury in arriving at the verdict which it did in this case.

Affirmed.

LUSK, J., concurs in result.