Argued and submitted January 5, reversed and remanded
April 29, 1971

CORNELIUS, *Respondent, v.*
BAY MOTORS INC., *Appellant.*

484 P2d 299

*John T. Foss*, Coos Bay, argued the cause for appellant. With him on the briefs were McKeown, Newhouse & Johansen, Coos Bay.

*Lawrence F. Cooley*, Eugene, argued the cause for respondent. With him on the brief were Sahlstrom, Starr & Vinson, Eugene.

TONGUE, J.

This is an action in strict liability for personal injuries sustained by the driver of an automobile which was "rear-ended" by an automobile with defective brakes and which had been sold by defendant as a used car on the very morning of the day of the accident.[1] Defendant appeals from an order granting plaintiff's motion for a new trial after entry of a judgment based upon a jury verdict for defendant. Plaintiff's motion for a new trial was based primarily upon the ground that the court had erred in denying plaintiff's motion for a directed verdict on the issue of liability.[2]

Three questions are presented on this appeal:

1. Does strict liability under Restatement (Second) of Torts § 402A, include sellers of used automobiles?[3]

---

[1] Plaintiff's complaint also included allegations of negligence.

[2] Plaintiff's motion for a new trial was also based upon the further ground that the trial court erred in refusing to allow plaintiff to offer medical testimony relating to a shoulder injury allegedly suffered by plaintiff as a result of the accident.

[3] § 402A provides in full as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

2. Does strict liability under § 402A extend to persons other than "users or consumers" of defective products?

3. Was the question whether the used car in question was in a "defective condition unreasonably dangerous," within the meaning of § 402A, properly submitted to the jury as a question of fact under an instruction that "unreasonably" in this context means "dangerous to an extent beyond that which would be contemplated by the ordinary purchaser?" Conversely, should the trial court have decided that question as a matter of law?

The determination of these questions depends largely upon the following facts.

On June 1, 1968, Gregory Keylock purchased for his daughter from defendant, an automobile dealer, a used 1961 Plymouth Valiant automobile, with approximately 50,000 miles of use, for $500. Mr. Keylock operated several trucks in his business and was a qualified aircraft mechanic. Defendant's salesman had previously sold some 20 cars or trucks to Mr. Keylock.

This seven-year old used car had been turned in on a trade and was in "real top-notch shape" at that time, according to its former owner. Some two years previously the master brake cylinder had been replaced, although it does not appear that this was known to

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Mr. Keylock. The previous owner also testified that he had no previous brake trouble.

Defendant's salesman testified that he was also a qualified aircraft mechanic and that before selling this car to Mr. Keylock he "checked the tires, engine, transmission, etc.," put it "through a pretty severe brake test" and drove it about 20 miles, during which he had no trouble with the brakes. He admitted that the level of brake fluid could have been checked, but that he did not do so. He testified, however, that if brake fluid had been leaking from the master cylinder there would have been fluid on the "fire wall" and that he also would have been able to smell the brake fluid inside the car, but that there was no smell of brake fluid prior to selling the car and nothing to indicate that the level of the brake fluid was low or that it was leaking at that time.

Mr. Keylock, the purchaser, testified that the car was sold to him with an "O.K. sticker," meaning that it had been "checked," and that the salesman said that it was in good condition. Before the car was delivered to his daughter, however, he drove it two or three miles to test it, including a "brake test." He looked underneath the car and saw no evidence of leaking brake fluid or of other defects in the brakes. He also did not check the level of the brake fluid, but testified that there was no indication that the brake fluid was low when he drove the car. He testified that when he tested the car it appeared to have "very good" brakes, but that a car "could have a brake failure without any prior warning for this sort of thing."

Laurie Keylock, the daughter of the purchaser, then picked up the car and drove it for several miles over a period of two hours, including stops for a music

lesson, to visit friends and to visit a root beer stand. During that period she used the brakes "several times" and they operated normally.

Approaching a stop light, however, at a speed of between 25 and 35 miles per hour, and when about three or four car lengths from cars ahead of her, she applied her brakes, but found that the "pedal went to the floor" and that the brakes "went out completely." As a result, her car "rear-ended" plaintiff's car. Defendant's salesman then arrived, tested the brakes, and found that there were "no brakes," with "no tension at all."

The car was then repaired by a mechanic, who testified as a witness on behalf of the plaintiff that the rubber "cups" in the master brake cylinder were "deteriorated enough to let the fluid through" and that when the car came to him the fluid was "leaking out the back end of the master cylinder." He also testified that to discover the deterioration of these rubber "cups" it would have been necessary to disassemble the master brake cylinder. He testified, however, that once these rubber "cups" start to leak, such a deteriorated condition then "accelerates so that the 'cups' fail rapidly or can fail rapidly," with the result that "all of a sudden you step on your brakes and you don't have any."

Thus, the mechanic also testified that once the rubber "cups" start to leak, even 30 to 35 applications of the brakes could "eject" sufficient fluid to cause such a brake failure. As a result, he said that it was possible that the rubber "cups" in the master cylinder did not start to leak until the day of the accident (after sale of the car that morning) and after 20 to 35 additional applications of the brake. To the same effect,

he testified that the brake fluid could have been at a normal level that morning and could have been "pumped dry" later that same day.

The mechanic testified at one point that an examination of matting in the fire wall the day before the sale "probably" would have revealed a leak in the brake fluid. At another point, however, he testified that the brake fluid has a distinctive odor and, if leaking, would create an odor inside the car. As previously noted, the salesman testified that prior to the sale of the car (including his test drive with the purchaser that morning) there was no such odor. He also testified that when he picked up the car after the brakes had "gone out" and had been repaired there was a "very strong" odor of brake fluid. Although admitting that in replacing the brake fluid, some might have been spilled in pouring, he said that was unlikely.

Upon conclusion of the testimony defendant moved for a directed verdict. Plaintiff also moved for a directed verdict on the issue of liability, contending that the brakes were "unreasonably dangerous in that they were dangerous to an extent beyond that which would be contemplated by the ordinary purchaser." Both motions were denied.

The case was then submitted to the jury under instructions which included the following:

"A product is dangerously defective when it is in a condition unreasonably dangerous to the user. 'Unreasonably' in this regard means dangerous to an extent beyond that which would be contemplated by the ordinary purchaser of this type of product in the community.

"* * * * *

"* * * 'Unreasonably,' in this context, means

dangerous to an extent beyond that which would be contemplated by the ordinary purchaser."

No exceptions were taken by plaintiff to the form of these instructions.

For the purposes of this case we may assume, without deciding, that the rule of Restatement (Second) of Torts § 402A, as expressly adopted by this court in *Heaton v. Ford Motor Company*, 248 Or 467, 470, 435 P2d 806 (1967), is binding upon dealers in used motor vehicles and also that the benefits of that rule extend to "bystanders" or other third parties injured by defective motor vehicles. Indeed, we expressly reserve ruling upon both of those questions.[③]

■ Regardless of the application of § 402A to dealers in used automobiles and to "bystanders" and other third parties, we hold that the facts of this case

---

[③] By its terms, § 402A is binding upon "one who sells *any* product in a defective condition unreasonably dangerous to the user or consumer * * *." (Emphasis added)

Thus, the rule, by its terms, is not limited to sellers of new products and no contention is made in this case that it is not binding upon sellers of used products. See Lewis v. E. F. Moore, Inc., (Pa Ct Com Pls 1967), 87 Mont Cty L R 379. Cf. Stamper v. Motor Sales, 25 Ohio St 2d 1, 3, 265 NE2d 785 (1971). See also Cintrone v. Hertz Truck Leasing and Rental Service, 45 NJ 434, 212 A2d 769, 776 (1965).

It is contended by defendant, however, that the rule, as stated, is limited to "users" and "consumers" and that the writers of the Restatement have expressly stated that the American Law Institute "expresses no opinion" upon the question whether the benefits of § 402A extend to persons other than "users" or "consumers" and "expresses neither approval nor disapproval of expansion of the rule to permit recovery by such persons." (See § 402A, "Caveat," p 349, and Comment o, pp 356-7.)

Among cases extending strict liability to bystanders see Mitchell v. Miller, 26 Conn Supp 142, 214 A2d 694, 699 (1965), and Elmore v. American Motors Co., 75 Cal Rptr 652, 451 P2d 84, 89 (1969). Cf. Blake v. Roy Webster Orchards, 249 Or 348, 437 P2d 757 (1968).

were such that the jury could have properly found that there was no liability under § 402A in this case.

By the terms of § 402A, the rule of strict liability is applicable to the sale of a "defective product *unreasonably dangerous* to the user or consumer." According to Comment i under § 402A:

"* * * The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

This court, in *Heaton v. Ford Motor Company*, *supra*, held that the application of this test under § 402A is ordinarily a question of fact to be decided by a jury. Thus, at p 472, we said that:

"* * * it is for the jury rather than the court to say in the ordinary case whether a given product failed to meet the standard."

and, at 474:

"The jury is supposed to determine the basically factual question of what reasonable consumers do expect from the product."

To the same effect, as stated by the dissenting opinion in *Heaton*, at p 478:

"The members of the jury draw upon their experiences and observations and set up some kind of a standard as a measure against which to appraise the defendant's conduct in the particular case."

See also *Storey v. Exhaust Specialties*, 90 Adv Sh 325, 255 Or 151, 464 P2d 831 (1970).⑨

---

⑨ See also Dickerson, "How Good Does a Product Have to Be?", 42 Ind L J 301 (1967), and Traynor, "The Ways and Meanings of Defective Products and Strict Liability," 32 Tenn L R 363 (1965).

Plaintiff contends that the seven-year old used car in this case was not only clearly defective, but that it was "unreasonably dangerous" as a matter of law, within the terms of § 402A. In support of that contention plaintiff says that under *Heaton v. Ford Motor Company, supra,* the question whether a product fails to meet the "reasonable expectations of the user" only becomes pertinent when there is "no direct evidence of the defect." In other words, plaintiff contends that only in the absence of direct evidence of the defect that it is necessary to consider the "reasonable expectations of the user" so as to provide the basis for an inference in such a case that the product was defective.

■ We do not so construe § 402A, particularly in view of Comment i, as quoted above, and did not intend in *Heaton* to adopt such a construction.

*Heaton* involved the sale of a new Ford pickup truck. In that case plaintiff was unable to offer direct evidence that the wheel of the truck involved was defective and urged that the court "should declare the wheel unreasonably dangerous as a matter of law for the reason that it failed to perform as an ordinary consumer would have expected it to perform" (p 472). This the court declined to do and the majority of the court were of the opinion that under the facts of that case there was not even sufficient evidence to submit the case to the jury.

Both the majority and the dissenting members of the court in *Heaton* agreed, however, that in the "ordinary case" (which would ordinarily include a case in which there is at least some direct evidence that the product involved was defective), the question whether the product was "unreasonably dangerous" is a question of fact for the jury. (See pp 472, 474 and 478.)

The majority in *Heaton* also stated that the jury should be allowed to find a product to be defective ("unreasonably dangerous") when the record contains evidence of either (1) a dangerous defect in manufacture (of which there was no evidence in this case), (2) an unreasonably dangerous design (of which there was also no evidence) or (3) "circumstances in which, from common knowledge, the average user reasonably could have expected the product to perform safely."

For all of these reasons, we hold that even though there was direct evidence in this case that this seven-year old used car was "defective," the basic question to be decided in this case is whether, under the evidence in this case, the jury could have properly found that this used car was not "unreasonably dangerous" within the meaning of § 402A, as amplified by Comment i and as previously construed by this court in *Heaton*.

It is, of course, well established that on a motion to set aside a jury verdict in favor of defendant, as in this case, the court must view the evidence in a light most favorable to the defendant, as the prevailing party, and giving him the benefit of every inference favorable to the defendant in such a case. *United Finance Co. v. Kliks*, 210 Or 288, 291, 310 P2d 1103 (1957).[*]

■ It should also be noted that in this case it is not necessary to decide whether a used car with dan-

---

[*] Plaintiff contends that the trial court should have directed a verdict in favor of plaintiff in this case because "there is no conflict in the testimony and it is susceptible of only one construction," citing Kohanek v. Rudie Wilhelm Warehouse Co., 129 Or 642, 648, 276 P 693, 695 (1929). While there was little conflict in the testimony in this case, we do not agree that it is "susceptible of only one construction."

gerous defects which are either known by the dealer or which he should have known by reasonable testing and visual inspection would be "unreasonably dangerous" as a matter of law, from the standpoint of "consumer expectation." This is because the jury could have properly found from the evidence in this case that the brakes worked properly upon being tested at and prior to the time of the sale and also that prior to the time of the sale the brake fluid had not yet leaked, so as to be subject to discovery by visual inspection.[7]

■ Thus, the jury could have found from the evidence in this case that although at the time of the sale the rubber "cups" in the master brake cylinder had deteriorated, they had not yet deteriorated to the point of permitting brake fluid to leak or be ejected from the master brake cylinder. In other words, in considering the issue of "consumer expectation," the jury could have found from the evidence in this case that the defect in the brakes was not a patent defect, but was a latent defect, and one not discoverable by reasonable testing or visual inspection.

The remaining and crucial question of fact to be decided by the jury in this case under the instructions of the court (to which no exceptions were taken) was whether an ordinary purchaser of a seven-year old used car would contemplate that the materials used in the construction of such a car could have crystallized or deteriorated to the point that such materials might break or collapse at any time. These materials could include, for example, the steel used in the wheel rims and steering arms and the rubber used in parts not

[7] Although such facts are usually relevant only in actions for negligence, they are also relevant in actions for strict liability on the issue of "consumer expectation."

subject to visual inspection, including the "cups" inside the master brake cylinder.

■ ■ After examining all of the testimony in this case, we have concluded that it would not have been improper for the jury, under the evidence of this case, and based upon its own experience, to find that the "ordinary purchaser" in Coos Bay, Oregon, of a seven-year old used car for $500 would expect or "contemplate" that after seven years and 50,000 miles of use some of the materials used in the construction of such a car, including the rubber "cups" inside the master brake cylinder, might have crystallized or deteriorated to the point that such materials might break or collapse at any time. For the same reasons, we do not believe that it would have been improper, under the evidence of this case, for the jury to find that an "ordinary purchaser" of such a used car, despite such "consumer expectation," would not regard such a used car as "unreasonably dangerous."

In other words, the jury could have properly found that the ordinary purchaser of such a seven-year old used car would recognize, expect and accept these possibilities in purchasing such a car and would not regard it as being "unreasonably dangerous" because of such possibilities. Stated otherwise, to paraphrase *Heaton*, at p 474, the jury could have properly found that the circumstances of this case were such that, from common knowledge, the average purchaser of a seven-year old used car with 50,000 miles of use, for $500, would have "reasonably expected" deterioration to the point that the vehicle might not perform safely.

Since, under the record in this case, there was evidence from which the jury could have properly made

such a finding, it follows that it would be improper for this court to hold that this used car was "dangerously defective" as a matter of law, even though we might not agree with such a finding. For the same reasons, it also follows that the trial court did not err in submitting this case to the jury (assuming that § 402A applies to sales of used motor vehicles and extends to third persons), but that it did err in later setting aside the verdict of the jury in granting plaintiff's motion for a new trial.[9]

Accordingly, this case must be remanded for reinstatement of the verdict of the jury and for entry of judgment for defendant on that verdict.

Reversed and remanded.

O'CONNELL, C. J., concurring.

The majority opinion says that, assuming Section 402A of the Restatement (Second) of Torts is available to bystanders and is binding on used car dealers, it was not error to submit this case to the jury. I agree with the holding that plaintiff was not entitled to a directed verdict. I do not agree, however, with the implication that, under the assumptions mentioned, this was necessarily a proper case for the jury. In my opinion, the majority has misconceived the na-

---

[9] Plaintiff's motion for new trial was also based upon the ground that the trial court erred in refusing to allow testimony of plaintiff's treating doctor relating to a shoulder injury alleged to have been suffered by him in this accident, in addition to injuries to his back and neck, as alleged in the complaint. We have examined the pleadings and the evidence and hold that the trial court did not err in excluding such testimony. In addition, plaintiff makes no contention on this appeal that the order granting a new trial must be affirmed for this reason, contending solely that the granting of a new trial must be affirmed in order that the trial court may direct a verdict for the plaintiff on liability and retry the case on the issue of damages alone.

ture of the functions of the court and the jury in these cases.

As I understand it, § 402A is intended to embody in the Restatement the principle of strict tort liability for the sale of a defective product as developed most fully in *Greenman v. Yuba Power Products, Inc.*, 59 Cal2d 57, 27 Cal Rptr 697, 377 P2d 897 (1963) and *Henningsen v. Bloomfield Motors*, 32 N J 358, 161 A2d 69, 75 ALR2d 1 (1960), and now adopted by a majority of the courts in the United States.

The underlying theory supporting this principle as expounded in *Greenman* is that the seller, being engaged in a commercial enterprise, should be made to bear the loss, at least where he is better able to absorb the cost or shift it through the pricing of his product.

We have rejected this reasoning on the ground that if it were adopted we would be obliged logically to employ it also in cases not involving the sale of products if the loss could be absorbed or shifted. *Wights v. Staff Jennings*, 241 Or 301, 405 P2d 624 (1965).

If this position is maintained, we must explain the applicability of § 402A on some basis other than enterprise liability. I have attempted to work out elsewhere an acceptable theory to explain the imposition of liability upon the sellers of products distinct from other defendants engaged in a commercial enterprise.[①] I shall not now review that explanation nor attempt to re-appraise it. Whether that explanation is right or wrong, I think that we ought to explain why and how § 402A applies in a particular setting.

---

[①] See my dissenting opinion in State ex rel Western Seed v. Campbell, 250 Or 262 at 276, 442 P2d 215 at 221 (1969) for a summary of this explanation.

This is especially important because our commercial code purports to deal with the subject of the seller's liability and we should, therefore, at least attempt to make our application of § 402A consistent with the legislative policy expressed in the code.

The code is drafted upon the assumption that the seller's liability is based upon an express or implied warranty of merchantability (or the warranty of fitness for a particular purpose, not germane here).[②] Even before *Greenman v. Yuba Power Products, supra,* the liability of the seller for breach of the implied warranty of merchantability could not be explained upon the basis of principles of contract law (even where the action was between the buyer and seller). Since the seller's liability fit more logically into the notions of tort law, it was finally recognized for what it was and is now ordinarily treated as a form of strict liability in tort. However, when strict liability was imposed under the theory of implied warranty of merchantability (whether conceived of as founded in implied contract or tort), the reason for imposing it was not stated in terms of enterprise liability as developed in *Greenman v. Yuba Power Products, supra.* The idea running through the implied warranty cases is that a seller who purports to sell an article of a certain character impliedly represents that the product meets the standard which an article of that type normally has in the market. We may assume that the legislature, in adopting the commercial code, intended to limit the

---

[②] See ORS 72.3140 and 72.3150

Many of the difficulties involved in the adoption and application of § 402A in light of the commercial code's warranty provisions are discussed in Titus, Restatement (Second) of Torts Section 402A and the Uniform Commercial Code, 22 Stan L Rev 713 (1970). See also Dickerson, Products Liability: How Good Does a Product Have to Be?, 42 Ind L J 301 (1967).

seller's liability within this framework of representational conduct, however implied. If so, § 402A must be similarly circumscribed.

As Dean Prosser has recently noted, the theory underlying strict liability is important in answering such questions as whether an injured bystander may recover:

> "The courts are going to be compelled to make up their minds as to what they are trying to do. Are they adopting a so-called socialistic theory, a compulsory insurance, risk distribution and so on? Or are they going to adopt the theory that this thing is justified by the defendant's conduct in putting the product on the market, and representing to the public that it is fit for use?" Prosser, Products Liability in Perspective, 5 Gonzaga L Rev 157, 170 (1970).

The underlying theory is just as important in determining what is a defect which makes a product unreasonably dangerous in a particular class of cases. Having rejected the enterprise liability theory, we ought to approach this question in each instance in terms of the nature of the seller's representations.[®]

---

[®] Our cases involving liability for the injurious side effects of prescription drugs, although not couched in these terms, are consistent with this approach. Cochran v. Brooke, 243 Or 89, 409 P2d 904 (1966); Lewis v. Baker, 243 Or 317, 413 P2d 400 (1966). In the latter case we held that

> ". . . a drug, properly tested, labeled with appropriate warnings, approved by the Food and Drug Administration, and marketed properly under federal regulation is, as a matter of law, a reasonably safe product." 243 Or at 324.

We held, in effect, that regardless of the degree of danger from side effects, a drug manufacturer would not be liable if he marketed his drug in accordance with applicable regulations and was not guilty of wilful or negligent mislabeling. In other words, he represents only that there are no impurities, that he has done what the drug laws require of him, and that he has disclosed all the dangers of which he knows or ought to know.

In this case we are concerned with how the seller of used goods, and specifically the seller of used automobiles, fits into this scheme of liability. When a seller of new automobiles sells one of them to a customer he impliedly represents that the automobile is adequately equipped with all the essentials that characterize a new vehicle of that type. It was for that reason we assumed in *Heaton v. Ford Motor Co.*, 248 Or 467, 435 P2d 806 (1967) that a seller could be liable for damages resulting from a defective wheel. (We were in disagreement as to the point at which the court or jury could reasonably conclude that a representation upon which a purchaser could justifiably rely had been made.) That conclusion did not commit us on the question of the character of the representation made by those selling used goods under various circumstances. It does not necessarily follow that because a seller of a new car is deemed to have made an implied representation as to the quality of the brakes, a used car dealer makes the same representation, or any·representation at all. It is for the court to decide whether a used car dealer is deemed to make a representation that the vehicle he is selling has brakes which are free from defects which could arise from normal use. This is the court's function of looking at the *general* character of men's dealings in the market place and deciding whether, as a normal course of such dealings, it is ordinarily understood by sellers and buyers that the seller represents, in effect. that he has inspected the car not only for patent defects but also defects which would be disclosed only by tearing down parts of the car in search for them.

I do not think that this is the understanding of either buyer or seller in the usual sale of used cars. In any event, it is not for the jury to decide whether

this is the *general* character of such sales. This is entirely different than the function of the jury where, as in *Heaton v. Ford Motor Co., supra,* we begin with the court-drawn conclusion that sellers of new cars are deemed to make representations that cars sold by them will have adequate wheels. The jury's function in such a case is to determine whether, beginning with that assumption, the wheels *in the particular circumstance* (i.e., where subjected to a certain type of impact) performed in a manner consistent with the representations expressly or impliedly made. It is permissible in that setting to permit the jury to find the representation by appraising the average purchaser's reasonable expectation as to the performability of the product. That is quite a different function than that which the majority opinion in this case indicates the jury is to perform. A products liability case, in my view, is for the jury only after the court has determined what the seller in the particular type of sale impliedly represents as to the condition of the product, and that the evidence discloses a possible breach of that representation.

DENECKE and HOLMAN, JJ., concur in this opinion.